**AVNET, INC., Petitioner,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

No. 73–1399.

United States Court of Appeals, Seventh Circuit.

Argued April 10, 1974.

Decided Feb. 28, 1975.

Howard P. Willens, Washington, D. C., for petitioner.

Gerald Harwood, Acting Asst. Gen. Counsel, F. T. C., Washington, D. C., for respondent.

Before FAIRCHILD, Chief Judge, and PELL and STEVENS, Circuit Judges.

STEVENS, Circuit Judge.

The Commission held that the acquisition by Avnet of two competing manufacturers of parts which are sold to rebuilders of automotive electrical units violated § 7 of the Clayton Act, as amended.[1] Avnet argues that it did not have a fair opportunity to meet the Commission's prima facie case because it did not anticipate the Commission's narrow definition of the relevant product market, and, in any event, that the evidence is insufficient to satisfy the Commission's initial burden on the relevant market issue. We find no unfairness in the way the case was tried and have no difficulty in concluding that the evidence adequately supports the Commission's findings.

As a preface to our discussion of Avnet's principal contentions, we shall briefly summarize the Commission's description of the industry, review the history of the proceedings, and identify the evidence which, according to Avnet, it was unable to present.

## I.

Among the automobile parts which may need to be replaced or repaired as a car ages are electrical units, such as generators, alternators, starters and voltage regulators. These "automotive electrical units," ("AEU's") are made by original equipment manufacturers ("OEM's") and by rebuilders. OEM's include the major automobile companies and other firms that produce equipment for installation on new vehicles. They sell replacement units to warehouse distributors ("WD's"), who in turn resell individual units, as well as components of such units, to retailers such as repair shops, service stations, garages and car dealers.

The record in this case demonstrates that the prices at which WD's sell new AEU's are significantly higher than the prices at which comparable AEU's can be rebuilt and sold at a profit. A used unit may be dismantled, cleaned and reassembled with such substitute components as may be needed.[2] Such rebuilding may take place in repair shops where one unit at a time is put back in working order for an individual customer ("custom rebuilding"), or in a production-line operation where units are rebuilt in large quantities and then sold to jobbers for distribution to the retail trade ("production-line rebuilding"). There are about 150 or 200 production-line rebuilders in the entire country.[3]

The "rebuilders supply industry" includes the firms which sell new components to rebuilders of AEU's. Counsel for the Commission consistently contended that the industry is composed of only 16 or 17 principal manufacturers with aggregate annual sales of about $20 mil-

---

1. The pertinent portion of Section 7 of the amended Clayton Act, 64 Stat. 1125 (1950), 15 U.S.C. § 18 (1970), provides:

    "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line

of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

The *Commission's* decision is reported at 82 F.T.C. 444 (1973).

2. The substitute components may themselves be either new or used or rebuilt.

3. The parties agree that the relevant geographic market in this case is nationwide.

lion.[4] The alleged violation resulted from the combination of IPM, the largest, and Valley Forge, the third largest, of these firms. Before the combination, IPM had sales of over $11 million and Valley Forge's were almost $2 million. Avnet acquired the assets of Valley Forge as of July 31, 1964, and those of IPM as of January 31, 1965. After the second acquisition, Avnet's sales represented about two-thirds of the total in the market as viewed by the Commission.

## II.

Both the complaint, which issued on April 1, 1969, and the amended complaint of December 1, 1969,[5] alleged that 16 firms, of which IPM and Valley Forge were the largest and third largest, supplied virtually the total value of equipment and parts furnished to rebuilders.

The evidentiary hearing commenced on February 1, 1971. During the preceding 16 months, the parties conducted pretrial discovery, argued about the adequacy of Avnet's compliance with discovery orders, stipulated about certain facts and issues, and agreed that, in advance of trial, each would provide the other with a list of witnesses and copies of proposed exhibits.

From the outset Avnet disputed the Commission's position that the market was composed of 16 principal firms.[6] It attempted, in three different ways, to develop evidence that the 16 firms have so many competitors that their sales do not comprise a relevant market or submarket. First, Avnet requested the Hearing Examiner to issue subpoenas to the 14 competitors of IPM and Valley Forge calling for disclosure of their customer lists, and thereafter to subpoena all those customers to learn their sources of supply. The Hearing Examiner quite properly rejected this request[7] and directed Avnet, at least as an initial matter, to make its own inquiries of the customers of IPM and Valley Forge. Second, according to Avnet's counsel, Avnet did attempt to develop evidence by a study of its own records and by interviewing its customers; presumably the results of those efforts were later incorporated in Avnet's presentation of evidence at the trial. Third, well after the trial was under way, through conver-

---

4. The following table lists the firms in complaint counsel's market with their sales to rebuilders. It will be noted that the Hearing Examiner has included 17 firms, although complaint counsel initially contended that only 16 were sufficiently significant to be relevant.

| Company | Sales | Market Share |
|---|---|---|
| | ($000) | (%) |
| IPM | 11,353 | 57.4 |
| Ace | 2,200 | 11.1 |
| Valley Forge | 1,856 | 9.4 |
| Vulcan Motor Products | 750–1,000 | 5.0 |
| VMC & Rebuilders Supply Co. | 1,000 | 5.0 |
| Carwin Sales | 511 | 2.6 |
| Butts Electric Supply Co. | 438 | 2.2 |
| American Starter Drive Service | 425 | 2.1 |
| Ennis Automotive, Inc. | 167 | .8 |
| Preferred Electric & Wire Corporation | 100–150 | .8 |
| Lincoln Bearing Co. | 138–165 | .8 |
| Starter Service Company, Inc. | 128 | .6 |
| Los Angeles Commutator | 122 | .6 |
| Precision Field Coil Co. | 95 | .5 |
| Jamison Parts | less than 70 | .4 |
| Hubert Products | 55 | .3 |
| Rich Engineering Co. | 46 | .2 |
| TOTAL | 19,781 | 100.00 |

82 F.T.C. at 414.

In addition, the Hearing Examiner and the Commission both noted that in 1964, Ford, Chrysler and General Motors had sales to authorized rebuilders which amounted to about 3% of the foregoing total.

5. The amendment excluded from the relevant line of commerce (1) the supply of used (as opposed to new) parts for rebuilt AEU's, and (2) the sale of parts by OEM's to "authorized rebuilders." An "authorized rebuilder" is one, who, pursuant to specific agreement with an OEM, is authorized to rebuild that firm's units. Although Avnet challenged the latter exclusion, the Commission noted that it related to only about 3% of total industry sales.

6. Avnet's answer denied the allegations in paragraph 15 of the complaint. Moreover, Avnet stipulated that one of the contested issues was: "Whether sixteen firms supplied virtually the total volume of equipment and new parts furnished to rebuilders in 1964?"

7. See Papercraft Corp. v. F. T. C., 472 F.2d 927, 930 (7th Cir. 1973).

sations with its sales personnel and through an independent market research study, Avnet sought to prove that the volume of business handled by custom rebuilders was so enormous that, by inference, there must be such a significant total volume of sales by rebuilder suppliers that the statistics relating to the 16 firms identified by the Commission should be disregarded as essentially meaningless. The Hearing Examiner excluded the market study for procedural reasons.[8]

On the basis of the voluminous evidence in the record, the Hearing Examiner concluded that the acquisition violated § 7 of the Clayton Act and recommended an order requiring Avnet to divest IPM. He found that the relevant market included the sale of new components by rebuilder suppliers to rebuilders and that the contours of the market were fairly delineated by the sales of the 16 principal suppliers to 150 to 200 production-line rebuilders. In so finding, he resolved the "sharp disagreement between the parties over the meaning of the term 'rebuilder' as used in paragraph 1(b) of the complaint."[9] His market analysis and conclusion summarizing competitive impact of the acquisition were corroborated in large part by an opinion expressed by a Valley Forge executive in memoranda outlining the advantages to Avnet of the acquisition of IPM.

In a carefully prepared opinion by Chairman Kirkpatrick, the Commission approved the findings and order proposed by the Hearing Examiner. Commissioner Dennison dissented on the ground that complaint counsel had not met their burden of demonstrating the size and dimensions of the relevant line of commerce.

### III.

The record contains a great deal of testimony by rebuilder suppliers and by production-line rebuilders. It is clear that the production-line rebuilders could not survive without an adequate source of supply of new parts. Because the prices charged by OEM's and WD's are so high, the production-line rebuilders must obtain such parts from rebuilder suppliers. The testimony indicates that they relied primarily on IPM, Valley Forge and two other suppliers for these parts.

Unlike production-line rebuilders, who operate at a manufacturing level and sell largely to jobbers, custom rebuilders operate at the retail level dealing directly with consumers. At that level, particularly since their charges cover their labor and specialized expertise, they can afford to purchase OEM parts from WD's. They may, of course, also purchase new, used, or rebuilt components from other sources, including rebuilder suppliers. We know that some of the rebuilder suppliers sell either nothing, or at most very little, to custom rebuilders,[10] and we also know that IPM makes some sales to custom rebuilders.[11]

8. The pretrial order required Avnet to list its exhibits by January 25, 1971. The Commission completed its case on February 25, 1971, and the trial was then recessed until May 6, 1971, to give Avnet time for additional discovery and preparation. On April 19, 1971, Avnet employed United States Testing Company, Inc. to conduct a survey, but made no disclosure of that fact until July 9, 1971, when it moved to amend its list of proposed exhibits. The Hearing Examiner denied the motion as untimely, emphasizing Avnet's past failure to act with appropriate diligence and candor in the preparation of the matter for trial.

9. See findings 18–40, 82 F.T.C. at 402–407, where the Examiner substantially equates the terms "rebuilder" and "production-line rebuilders," on the one hand, and "repair shops" and "custom rebuilders," on the other, to exclude custom rebuilders from the demand side of the market.

10. The testimony of some representatives of the rebuilder suppliers made it quite clear that their sales to custom rebuilders were not significant. See, for example, the testimony of the witnesses Flynn (App. 591–592, 593–594), Kamber (App. 617), Green (App. 602), Winters (App. 663), and McCullough (App. 686).

11. Since IPM has a list of 3,500 customers and since there are only 150 or 200 production-line rebuilders in the country, it is fair to infer that at least some of IPM's customers were custom rebuilders. Of course, the number of customers tells us little about their volume of purchases. There is a stipulation in the record describing IPM's sales to 49

But the record does not tell us what portion of the rebuilder suppliers' total sales, or even what portion of IPM's or Valley Forge's total sales, were to custom rebuilders rather than production-line rebuilders.

Avnet contends that such information is of critical importance in appraising the Commission's definition of the relevant market, and that it was prevented from developing such evidence as well as any other evidence identifying the dimension of the business of supplying custom rebuilders throughout the country, by the Commission's failure to give it adequate notice that the Hearing Examiner, and ultimately the Commission, would decide that the term "rebuilders" includes only production-line operators and excludes custom rebuilders. As we understand Avnet's principal argument, which is phrased in terms of a "denial of administrative due process," if its counsel had understood the theory of complaint counsel's case they would have proved (a) that for the purposes of this case, any distinction between production-line rebuilders and custom rebuilders is invalid,[12] and (b) that the inclusion of sales to custom rebuilders would so enlarge the relevant market as to undermine completely the Commission's prima facie case. Specifically, Avnet contends that it would not have waited so long (1) to develop evidence from its own sales personnel describing the 3,300 customers of IPM who are not production-line rebuilders, and (2) to obtain a market study delineating the volume done by custom rebuilders.[13]

customers with individual annual purchases ranging from $23.25 to $5,165.44. These figures are to be contrasted with IPM's total sales of over $11 million. We have not found any evidence, or any offer of proof, by either party establishing the dollar value of sales by IPM or Valley Forge to production-line and custom rebuilders, respectively.

12. In its brief at page 28 and footnote 22, Avnet states:

"First, because Avnet lacked adequate notice, it was unable to develop and present vital evidence to support its contention that sales to all the kinds of rebuilders reflected on IPM's list of 3,500 active customers should be included in the relevant market. If the Commission's Amended Complaint had charged that only sales to a definite class of 'production-line rebuilders' were to be included in the market, Avnet would have had the opportunity to survey its active customers to ascertain which among them fit the Commission's definition of production-line rebuilders, to ascertain its sales to such rebuilders, to elicit evidence regarding their other suppliers, to demonstrate that these rebuilders compete directly with other kinds of rebuilders, and to conduct those additional inquiries which would be reasonably expected to yield relevant evidence regarding the validity of the Commission's restrictive definition of the term 'rebuilder.'[22] No such discovery efforts were undertaken by Avnet—for the sole reason that it was not given fair notice by the Commission that such inquiries were either required or relevant.

[22] Fragmentary evidence on many of these issues is contained in the record. Avnet maintains, for example, that the record demonstrates the existence of real competition for the ultimate consumer's dollar between custom rebuilt and production-line rebuilt electrical units. (see, e. g., RPF 215–22, App. Vol. IV, and the transcript references contained therein.) The point in the text, however, is that Avnet was denied any opportunity during the prehearing stages of this proceeding to develop the kind of comprehensive evidence necessary to demonstrate the invalidity of the arbitrary definition of rebuilder subsequently adopted by the Hearing Examiner and the Commission."

13. Avnet contends that its survey would have shown a market for new, rebuilt and used parts of more than $300 million and, if admitted, would have rebutted the Commission's evidence tending to prove a relevant market of only about $20 million. We have examined the study identified as Respondent's Exhibit 88 (Rejected); we find no offer of supplementary expert oral testimony. For at least three reasons, the rejected exhibit does not appear to us to be inconsistent with the Commission's analysis of the market. First, it apparently includes sales of rebuilt AEU's which include used and rebuilt, as well as new, components; second, it apparently includes sales of custom rebuilt units which include components purchased from WD's and, therefore, indirectly from OEM's; and third, its price analysis is directed to the retail market, whereas IPM, Valley Forge, and

## IV.

■ We find Avnet's "administrative due process" argument unpersuasive. It relies largely on the fact that both the amended complaint and a trade practice rule [14] promulgated by the Commission contain a functional definition of the term "rebuilder" which can be read to include custom rebuilding as well as production-line rebuilding, and on the further fact that the amended complaint described the demand side of the market as "highly fragmented," and referred to IPM's sales "to over 5,000 independent distributors and rebuilders."

Avnet had no reason to rely on the trade practice rule as significant in this proceeding. The rule relates to the manner in which rebuilt units must be labeled when they are sold. Since, by hypothesis, custom rebuilding does not involve the sale of any such unit, but rather the reconstruction of the customer's property, the rule is, in terms, inapplicable to the issue here.

Avnet's reading of the complaint was, however, reasonable. The reference to "over 5,000" customers of IPM certainly implied that all of IPM's sales were intended to be treated as within the relevant market; since presumably some of those sales were to custom rebuilders, one might well infer that the market was intended to include all custom rebuilders. But even if Avnet's counsel did originally assume that complaint counsel intended to treat all sales to custom rebuilders as part of the relevant market, it soon became manifest that the critical question in the case was whether or not counsel was correct in using the list of 16 firms to outline a relevant market. Arguably, but by no means necessarily, the answer to that question would be affected by the definition of the term "rebuilder" and, more narrowly, by whether sales to custom rebuilders would be treated as relevant. For that reason, as the Examiner found, a "sharp dispute" between the parties developed over the proper definition of that term. The portions of the record which are before us do not indicate precisely when that dispute developed. We are not at all persuaded, however, that the dispute arose so late in the proceeding that Avnet was powerless to muster evidence or argument to meet complaint counsel's case.

We note that Avnet's argument before the Hearing Examiner anticipated complaint counsel's position that only sales to production-line rebuilders were relevant.[15] We also find no discussion in Chairman Kirkpatrick's opinion for the Commission of any claim that Avnet was surprised by the definition of the term "rebuilder." The Commission did explain in detail its agreement with the Examiner's exclusion of custom rebuilding from the demand side of the market [16] and with his procedural and

their competitors were selling to companies engaged in the manufacturing business who sold largely to jobbers, who in turn would resell to retailers. We find nothing in the study shedding any light on the magnitude of sales *at the level at which IPM and Valley Forge sold.* We are inclined to attach greater significance to Avnet's failure to make a timely offer of a breakdown of its own sales to custom rebuilders and production-line rebuilders than to any extrapolation suggested by the rejected offer.

**14.** The FTC rule provides that a product cannot be identified as "rebuilt" or "remanufactured" unless it has been

"dismantled and reconstructed as necessary, all of its internal and external parts cleaned and made free from rust and corrosion, all impaired, defective or substantially worn parts restored to a sound condition or replaced with new, rebuilt or unimpaired used parts, all missing parts replaced with new, rebuilt or unimpaired used parts, and such rewinding or machining and other operations performed as are necessary to put the industry product in sound working condition." 16 C.F.R. § 62.3(b) (1974) (footnotes omitted).

The rule also provides that units can be sold as "rebuilt" only after they have undergone this process and are labeled as rebuilt. Units which are not sold, or are not sold "to the trade," need not be labeled if it is "clearly understood by all purchasers . . . that the products, or parts thereof . . . have been used." 16 C.F.R. § 62.1(b)(1).

**15.** *See* App. 220.

**16.** *See* 82 F.T.C. at 448 et seq. The Commission stated:

"*Throughout the proceeding below and on appeal,* respondent has contended that

evidentiary rulings.[17] But Chairman Kirkpatrick's opinion does not even mention the inadequate notice argument that Avnet advances in this court.

Without further belaboring the point, we merely state that our review of the record convinces us that Avnet's counsel had sufficient understanding of the issues, and sufficient time to prepare Avnet's defense, to require rejection of the argument that they were denied administrative due process when the Hearing Examiner accepted complaint counsel's definition of the term "rebuilder." The test of fairness as stated in Cella v. United States, 208 F.2d 783, 789 (7th Cir. 1953), cert. denied, 347 U.S. 1016, 74 S.Ct. 864, 98 L.Ed. 1138, and L. G. Balfour Company v. F. T. C., 442 F.2d 1, 17–19 (7th Cir. 1971), was easily met.[18]

## V.

We also find no merit in the argument that the Commission relieved complaint counsel of the burden of proving the size of the relevant market and thereby deprived Avnet of administrative due process. The Examiner did not purport to make any such ruling. On the contrary, he found that the census data, the industry witnesses' testimony, the sales data for the 16 principal rebuilder suppliers, and the corroborating expressions of

opinion in memoranda prepared by the witness Fischer, an executive of Valley Forge, constituted sufficient evidence on which to predicate the conclusion that complaint counsel had met their burden of proof.[19]

## VI.

At pages 42–57 of its brief, Avnet argues that the Commission erred on the merits by artificially limiting the relevant market in two respects: first, by excluding sales to customer rebuilders, and second, by excluding sales of used and rebuilt parts.

■ The second exclusion was manifestly correct. The Commission found that prices for rebuilt or reconditioned used components varied from 25% to 50% below the prices for comparable new items.[20] Moreover, it noted the absence of any substantial interaction in price between the two lines. These factors are sufficient to support the finding that they should be placed in different submarkets. See Brown Shoe Co., Inc. v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510; United States v. Aluminum Company of America, 377 U.S. 271, 276, 84 S.Ct. 1283, 12 L.Ed.2d 314; cf. United States v. Aluminum Company of America, 148 F.2d 416, 425 (2d Cir. 1945).

---

the term 'rebuilder' refers to all firms that engage in the physical operation of disassembling a unit, cleaning, testing, replacing or reconditioning defective or worn parts, and reassembling and testing the finished product." 82 F.T.C. at 449 (Emphasis added).

This statement provides a sufficient basis for distinguishing Rodale Press, Inc. v. F. T. C., 132 U.S.App.D.C. 317, 407 F.2d 1252, 1255–6 (1968), and Bendix Corporation v. F. T. C., 450 F.2d 534 (6th Cir. 1971), both of which involved a complete change in theory at the Commission level.

17. See 82 F.T.C. at 468–473.

18. In Cella we stated:
"In an administrative proceeding it is only necessary that the one proceeded against be reasonably apprised of the issues in controversy, and any such notice is adequate in the absence of a showing that a party was misled."

In Balfour we stated:
"As the Commission case against petitioners unfolded, there was a 'reasonable opportunity to know the claims of the opposing party and to meet them.' " 442 F.2d at 19.

19. In United States v. Connecticut National Bank, 418 U.S. 656, 94 S.Ct. 2788, 41 L.Ed.2d 1016 (1974), the Supreme Court characterized the quality of the government's burden of proving the contours of the relevant geographic market as its "role to come forward with evidence delineating the rough approximation of localized banking markets . . ." 418 U.S. at 669, 94 S.Ct. at 279. Presumably a similar "rough approximation" may be sufficient to make out a prima facie case on the relevant product market issue.

20. Respondent is incorrect in its statement that the Commission ignored the fact that the commonly quoted "exchange price" for rebuilt parts includes a used core as part of the purchase price. Avnet's brief at page 55. See Commission opinion at 82 F.T.C. 457–458.

We are also persuaded that the omission of sales to custom rebuilders was not error. The Commission, of course, has the initial burden of explaining why a particular group of buyers or sellers should not be included within the relevant market. In this case the Commission met that burden by proving that custom rebuilders and production-line rebuilders perform significantly different functions and operate at significantly different levels of distribution within the overall market for the repair or replacement of AEU's. The custom rebuilder is primarly a retailer of services; the production-line rebuilder is a manufacturer of products which are sold largely to jobbers, and presumably to retailers as well.[21] In our opinion, the clear functional difference between the two groups of rebuilders provides an adequate prima facie basis for placing them in different submarkets.[22]

It is, of course, entirely possible that the rebuilder suppliers may sell sufficient quantities of parts to custom rebuilders at prices comparable to those charged to production-line rebuilders to support the conclusion that such sales should be treated as part of the relevant market. If that be the fact, however, since the Commission satisfied its initial burden it was incumbent upon Avnet to prove that the custom rebuilders made purchases from competitors of IPM and Valley Forge in significant volume. That burden could not be discharged by evidence concerning purchases of used or rebuilt parts, or by evidence of purchases of OEM parts from WD's. The testimony of the industry witnesses indicated that the volume of purchases by custom rebuilders from the principal rebuilder suppliers was not significant.[23] It therefore seems improbable that detailed evidence concerning the volume of sales of new parts to custom rebuilders by rebuilder suppliers would be significant. But even assuming that it might be, Avnet did not make a timely, or a complete, offer of proof showing the amount of its own, or of any of its competitors', sales to custom rebuilders. Quite clearly, Avnet did not overcome the Commission's prima facie showing that purchases by custom rebuilders were not part of the relevant market.

The Commission's analysis of this aspect of the case is corroborated by statements made by a vice-president and director of Avnet in a pre-acquisition memorandum. That memorandum states, in part:

**21.** As the Commission noted in its opinion: "The facts found by the judge demonstrate that production-line rebuilders sell a product, not a service, to entirely different classes of customers at different distribution levels using completely different pricing methods." 82 F.T.C. at 450.

**22.** This conclusion is buttressed by the fact, as stated by the Commission, that "while production-line rebuilders could not operate without a supply of new parts from rebuilder suppliers, custom rebuilders buy their new parts primarily from OEM wholesale distributors at prices 20–40 percent higher than those charged by the rebuilder suppliers." 82 F.T.C. at 450. The Commission added the following footnote at this point in its opinion:

"[13] Although the judge in his initial decision made no finding as to the differential, between the prices charged to rebuilders by wholesalers and those charged by rebuilder suppliers, the testimony cited by the judge demonstrates that WD prices to rebuilders were at least 20–40 percent higher than rebuilder supplier prices. For example, the President of Precision Field Coil noted that WD prices for General Motors' field coils were $4.41 while Precision sold to rebuilders at $2.76. (Tr. 538–39). One of the nation's largest rebuilders testified that IPM's prices were at least 20 percent cheaper than WD prices. (Tr. 843). The President of Valley Forge indicated that Valley Forge and IPM generally sold at a price 70 percent off OEM list price while jobbers sold at a 50 percent discount. (CX 37e). Thus, jobbers sold at prices over 60 percent greater than those of rebuilder suppliers."

Unquestionably the substantial price differentials make it appropriate to exclude the sales by OEM distributors to custom rebuilders from the market under study in this case. It necessarily follows, therefore, that it would have been inappropriate to include *all sales* to custom rebuilders in the relevant market.

**23.** See, e. g., App. 591–592, 594, 602, 617, 663, 686.

The acquisition of IPM would serve chiefly to remove our most major competitor from the scene. This would reduce to an overwhelming extent the price competition that is a major factor in the industry. In many cases severe competition has held profit margins on key items to a reduced level owing to the ability of two firms to offer substantially the same item at the same price. IPM has been very active in offering preferential discounts to large customers which Valley Forge has been obliged to meet. It is recognized by both Valley Forge and IPM that we must retain a reasonable share of the business from the larger users for they represent the primary target of any substantial tooling. We both recognize that large customers are necessary for our continued growth. This has produced a situation where the large customer has used his position to play off one against the other. In this situation Maremont has been the chief offender and has used their purchasing power in the most effective manner.

Quite plainly this comment supports the inference that competition for the patronage of the production-line rebuilders was of paramount importance to the rebuilder suppliers and tends to justify discounting the significance of their sales to custom rebuilders.

### VII.

Finally, Avnet objects to the portions of the order which require (1) divestiture of IPM rather than Valley Forge, and (2) Commission approval of any acquisition by Avnet of a supplier of used or rebuilt parts during the next 10 years.

■ Deference must be accorded to the Commission in fashioning the appropriate remedy. *See* Papercraft Corp. v. F. T. C., 472 F.2d 927 (7th Cir. 1973), and cases cited at 933 n. 17. Since it was the acquisition of IPM, rather than the earlier acquisition of Valley Forge, which violated the statute,[24] and since the record indicates that Avnet has caused Valley Forge to emphasize expansion in its ignition parts business rather than the rebuilders supply business, it was manifestly appropriate for the Commission to order divestiture of IPM.

■ We are also persuaded that even though the competition between used or rebuilt parts and new parts is not sufficiently intense to require the former to be treated as part of the relevant market for purposes of determining whether a violation occurred, it was nevertheless permissible for the Commission to consider the significance of that competition, together with Avnet's past history of acquisitions, in defining the scope of Avnet's obligation to obtain Commission approval of future acquisitions. We are unwilling to say that this portion of the remedy does not have a "reasonable relation to the unlawful practices found to exist." Federal Trade Commission v. National Lead Co., 352 U.S. 419, 429, 77 S.Ct. 502, 1 L.Ed.2d 438.

Accordingly, we affirm and enter judgment enforcing the order of the Commission.

---

**24.** Accordingly, the IPM assets have been "held . . . contrary to the provisions of [§ 7 of the Clayton Act]." *See* United States v. ITT Continental Baking Co., 420 U.S. 223 at 240, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975), and cases cited therein.