**BEATRICE FOODS COMPANY,**
**Petitioner,**

v.

**FEDERAL TRADE COMMISSION,**
**Respondent.**

**No. 75–1771.**

United States Court of Appeals,
Seventh Circuit.

Argued April 13, 1976.

Decided Aug. 18, 1976.

---

Edward L. Foote, Chicago, Ill., for petitioner.

Gerald Harwood, D. Barry Morris, Attys., Federal Trade Commission, Washington, D. C., for respondent.

Before CASTLE, Senior Circuit Judge, and SWYGERT and CUMMINGS, Circuit Judges.

CASTLE, Senior Circuit Judge.

Beatrice Foods Company of Chicago, Illinois, asks this court to review the July 1, 1975, opinion and order of the Federal Trade Commission finding Beatrice's acquisition of the assets of Essex Graham Company to be violative of section 7 of the Clayton Act, 15 U.S.C. § 18,[1] and directing divestiture.

I.

Beatrice is a multinational and multiproduct company with traditional emphasis in foods and food-related services. Its recent history, however, is marked by wide diversification into many non-food fields. In this regard, Beatrice acquired the stock and assets of Tip Top Brush Company and its various affiliated companies in July of 1969 and one year later acquired the Essex Graham Company. Tip Top is a leading manufacturer of paint brushes and rollers; Essex manufactures paint rollers.

---

1. The pertinent language of section 7 provides:

No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall ac-

quire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

In October of 1971, the Federal Trade Commission issued an administrative complaint against Beatrice alleging that its acquisitions of Tip Top and Essex violated section 7 of the Clayton Act since their effect may be substantially to lessen competition or to tend to create a monopoly in the manufacture and sale of "manually-powered paint applicators" [2] in the United States. Beatrice denied the alleged illegality of the acquisitions and a hearing was subsequently held before an administrative law judge.

The administrative law judge determined that paint brushes (including varnish brushes) and paint rollers (together with accessory products) each separately and both together constituted relevant lines of commerce for section 7 purposes. He further found the relevant geographic market to encompass the entire United States.

As to Beatrice's acquisition of Tip Top, the administrative law judge concluded that an insufficient showing had been made by the Commission's counsel that Beatrice was a likely potential entrant into the brush and roller market and that even if it were, elimination of it as a future entrant would not substantially lessen competition. The law judge also declined to find that the acquisition entrenched Tip Top in the market in a manner that would hinder competition by providing Tip Top with access to Beatrice's "deep pocket" for capital expansion loans. However, with regard to Beatrice's acquisition of Essex Graham, the administrative law judge found that the acquisition substantially lessened actual competition in both the combined brush-and-roller market and the roller submarket and that Essex was eliminated as the most likely entrant into the paint brush market. As viewed by the law judge, the "manually powered paint applicator" industry and the roller submarket were both experiencing trends of rising concentration. The acquisition of Essex by Beatrice would result in the combination of the third ranking firm in the combined brush and roller market (Tip Top) with the thirteenth ranking firm (Essex); and the fifth ranking firm in the roller submarket (Tip Top) with the eighth ranking from (Essex). Such an acquisition, the law judge held, would accelerate the already present trend of rising concentration in both markets.[3]

The acquisition of Essex having been found to violate section 7, Beatrice was ordered to divest itself of Essex and further ordered to cease and desist from acquiring any interest in any concern "engaged in the manufacture or sale of manually powered paint applicators" or "engaged in the manufacture or sale of raw materials" to such types of companies.

Both parties cross-appealed the administrative law judge's decision; Beatrice contesting the finding that the Essex acquisi-

**2.** This term was defined in the complaint and the order of the Commission as including "paint and varnish brushes; paint rollers including pans, covers, handles, and other accessories sold separately, or as part of a paint roller kit; and miscellaneous paint applicators other than spray equipment and aerosol cans." The Commission labeled the term "infelicitous" and referred instead to "brushes and rollers." For the sake of simplicity, we shall also refer to "brushes and rollers" in this opinion.

**3.** The administrative law judge made the following findings regarding market structure. In 1969, Tip Top manufactured 7.6% of the shipments in the brush-and-roller market, ranking third. The same year, Essex's shipments constituted 2.3% of that market, ranking thirteenth. In 1969, Tip Top also ranked eighth in the roller submarket, manufacturing 3.7% of shipments and Essex ranked fifth, manufacturing 7.0% of shipments. Prior to the Essex acquisition, there had been a clear increase in concentration in both markets. During the period 1967 through 1969, the market percentage of the top four firms in the brush-and-roller market rose by 12.8% from 36.6% in 1967 to 41.3% in 1969. Over the same period, the market share of the top eight firms rose 18.4%, from 52.8% in 1967 to 62.5% in 1969. The merger of Tip Top and Essex resulted in the 1969 four-firm concentration figure increasing from 41.3% to 43.6% and the eight-firm figure from 62.5% to 64.8%. In the roller submarket, the top four firms shipped 58.1% of all rollers in 1969. The merger of Tip Top and Essex resulted in Tip Top becoming the third ranking firm in the submarket and the four-firm concentration figure increasing from 58.1% to 61.6% and the eight-firm figure rising from 78.6% to 80.8%.

tion was unlawful and the counsel for the Commission attacking the finding that the Tip Top acquisition was lawful. The Commission upheld the initial decision of the administrative law judge[4] and adopted his order. Beatrice thereupon sought review of the Commission's decision in this court.

## II.

On review, Beatrice advances several arguments for reversal of Commission's decision and order regarding the Essex acquisition. We shall address each.

## A.

Beatrice advances a two-pronged attack on the relevant product market definitions determined by the administrative law judge and adopted by the Commission. First, Beatrice contends that the law judge and the Commission erred in defining the relevant product markets to encompass only brushes and rollers and to exclude aerosols and other more sophisticated power spray equipment. Second, Beatrice insists that the law judge and the Commission erred in failing to divide the brush and roller market into separate "professional" and "do-it-yourself" submarkets. We disagree with both contentions.

## 1.

Beatrice maintains that the evidence presented to the law judge cannot support his exclusion of aerosols and spray equipment from the relevant product market. The market as determined by the law judge, consisting of only brushes and rollers, argues Beatrice, is the result of the law judge and the Commission limiting their analysis to the scope of the market as viewed from the perspective of sellers only and not that of buyers also, as "the law commands."

We, of course, recognize that "any test 'which ignores the buyers and focuses on what the sellers do, or theoretically can do, is not meaningful'" in determining a relevant product market. *L. G. Balfour Company v. FTC,* 442 F.2d 1, 11 (7th Cir. 1971), quoting *United States v. Bethlehem Steel Corp.,* 168 F.Supp. 576, 592 (S.D.N.Y. 1958); see also *Cass Student Advertising, Inc. v. National Educational Advertising Service, Inc.,* 516 F.2d 1092, 1095 (7th Cir. 1975), *cert. denied,* 423 U.S. 986, 96 S.Ct. 394, 46 L.Ed.2d 303 (1975). But we cannot agree with Beatrice that the law judge and the Commission did so ignore the "rivalry for the custom of buyers," *United States v. Bethlehem Steel Corp., supra,* 168 F.Supp. at 592, in determining the relevant product market in the instant case.

The administrative law judge found that most of the large manufacturers of brushes also manufacture rollers and most of the large roller manufacturers also manufacture brushes. He also found that brushes and rollers are distributed by the same firms to the same buyers and that both are generally shipped, stocked, merchandized, and promoted together. Aerosols and spray equipment,[5] on the other hand, were found to be manufactured and sold by firms other than those which manufacture and sell brushes or rollers. The law judge found that aerosols and sprays are manufactured utilizing technology, machinery, and raw materials substantially different from those employed in the production of brushes or rollers.

While such findings are certainly useful in determining the relevant market from the sellers' perspective, the law judge entered other findings which formed the basis for determining the relevant market from the buyers' point of view. The law judge found that paint brushes and rollers are

---

**4.** The Commission found it unnecessary to decide whether the elimination of Essex as a potential entrant into the paint brush submarket amounted to a separate violation of section 7.

**5.** There are three basic types of sprayers: conventional, airless, and electrostatic. A conventional sprayer is powered by compressed air generated by an air compressor. Airless sprayers employ hydraulic pressure and electrostatic sprayers apply paint to an object by placing an opposite electrical charge on the item to be painted from the electrical charge of the paint.

"interchangeable in use to a very great degree." As to aerosols, however, he found that they are used for "specialized painting applications for which the use of a paint brush or roller would be impractical." Aerosols, he found, are not used for "larger flat surfaces as their cost for such applications would far exceed the cost of applying paint by paint brush or roller." Sprayers, he found, are used to apply paint on "small specialty jobs such as iron work and irregular surfaced items, and by painting contractors for large, outdoor jobs." Thus, it cannot be said that in determining the relevant product market in the instant case the law judge ignored the "custom of buyers."

Beatrice does not dispute any of these findings. Rather, it maintains that the market as defined is incomplete or "gerrymandered." Beatrice thus argues that these findings cannot support the market as defined by the law judge and the Commission. Beatrice contends that the evidence demonstrates that rollers are interchangeable with brushes for some *but not all* tasks. For instance, while brushes and rollers may be interchangeable for certain jobs such as painting large, flat surfaces, Beatrice points out that they are not interchangeable for other tasks such as painting intricate objects which require applying paint to non-flat, "hard-to-reach" places. With regard to these latter types of jobs, Beatrice maintains that aerosols and sprayers, and not rollers, are interchangeable with brushes. Beatrice's ultimate conclusion, therefore, is that since rollers, aerosols, and sprayers are interchangeable with brushes for certain tasks but not for others, all three must be included in any product market with brushes rather than just rollers. We disagree.

■ The mere fact that several products are limited substitutes for one another and thus form a broad product market is not dispositive of whether they form a relevant product market for antitrust purposes. In *Brown Shoe Co. v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), the Supreme Court stated that while "[t]he

outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it," nevertheless within such a broad market "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Id.* at 325, 82 S.Ct. at 1523. Thus, the question is not whether brushes, rollers, aerosols, and sprayers constitute a market, but whether the Commission could properly find that brushes and rollers alone constitute a line of commerce.

■ To aid in the determination of the boundaries of a market, the Court in *Brown Shoe* set forth several "practical indicia" for consideration in each case. These indicia are (1) the industry or public recognition of the submarket as a separate economic entity, (2) the product's peculiar characteristics and uses, (3) unique production facilities, (4) distinct customers, (5) distinct prices, (6) sensitivity to price changes, and (7) specialized vendors. *Id.* Considering these indicia in the context of the instant case, we conclude that the Commission justifiably excluded aerosols and sprayers in determining the relevant market to include only brushes and rollers.

The administrative law judge found that the industry recognized brushes and rollers as a separate industry as evidenced by the fact that the Bureau of Census categorizes brushes and rollers alone in the same five-digit Standard Industrial Code category. The law judge found that aerosol manufacturers regard themselves as a separate industry. Brushes and rollers were also found to possess certain peculiar characteristics apart from those of either aerosols or sprayers. The former are manufactured from raw materials utilizing a technology vastly different from those employed in the manufacture of aerosols and sprayers. Furthermore, as related earlier, rollers were found to be interchangeable with brushes to a far greater degree than were either aerosols or sprayers. Also, brushes and rollers were found to possess prices distinct from

aerosols or sprayers.[6] Sprayers were found to be priced substantially higher than rollers or brushes. Finally, the law judge found that manufacturers of brushes and rollers do not consider the prices of aerosols or sprayers in setting their prices. Based on these findings, none of which Beatrice attacks as lacking substantial evidence in support, the Commission clearly could determine that brushes and rollers constituted a relevant product market.

This case is very similar to the situation before the Court in *United States v. Continental Can Company,* 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964), involving a merger between a glass container manufacturer and a metal can manufacturer. Although the evidence showed that glass and metal containers were not interchangeable in every end use, and that other types of containers such as plastic, foil, and paper were interchangeable for some end uses, the Court nevertheless held that glass and metal containers properly formed a separate product market, stating:

> Nor are we concerned by the suggestion that if the product market is to be defined in these terms it must include plastic, paper, foil and any other materials competing for the same business. That there may be a broader product market made up of metal, glass and other competing containers does not necessarily negative the existence of submarkets of . . . cans and glass together, for "within this broad market, well-defined submarkets may exist which in themselves, constitute product markets for antitrust purposes." [*Id.* at 457–58, 84 S.Ct. at 1747, quoting *Brown Shoe Co. v. United States, supra,* 370 U.S. at 325, 82 S.Ct. 1502.]

Similarly, in the instant case the fact that aerosols and other spray equipment are interchangeable with brushes and rollers for some limited end uses does not negative the existence of a separate brush-and-roller market.

2.

Beatrice's second attack against the Commission's market definition is that it erred in failing to divide the combined brush-and-roller market into separate "professional" and "do-it-yourself" submarkets based upon price and quality distinctions between the products manufactured by Tip Top and Essex. Beatrice points out that Tip Top is largely a manufacturer of inexpensive, low-quality brushes intended for home use, while Essex largely manufactures higher-priced and higher-quality rollers intended for professional use. This price/quality distinction, Beatrice contends, results in the absence of competition between Tip Top's brushes and Essex's rollers and accordingly requires their placement in separate submarkets for analysis of the merger.

Prior cases indicate that price/quality distinctions in products may play a role in market definitions where articles are sold in clearly separate price groupings that have little or no price sensitivity between them. See, e. g., *Avnet, Inc. v. FTC,* 511 F.2d 70 (7th Cir.), *cert. denied,* 423 U.S. 833, 96 S.Ct. 56, 46 L.Ed.2d 51 (1975). Price differentials may also be significant when they are clearly indicative of such quality distinctions that articles of different prices are not interchangeable for particular purposes. See, e. g., *A. G. Spalding & Bros., Inc. v. FTC,* 301 F.2d 585 (3d Cir. 1962). Otherwise, "[t]he boundaries of the relevant market must be drawn with sufficient breadth to include the competing products of each of the merging companies and to recognize competition where, in fact, competition exists." *Brown Shoe, supra,* 370 U.S. at 326, 82 S.Ct. at 1524; see also *American Crystal Sugar Company v. Cuban-American Sugar Company,* 259 F.2d 524 (2d Cir. 1958).

---

**6.** While it is true, as Beatrice points out, that an individual aerosol and a small "throwaway" brush are comparatively priced, Beatrice fails to realize that since an aerosol is not reusable once it expends its contents, several must be employed to apply the same amount of paint that one brush applies in any one task, thus resulting in quite disparate prices between the two products in practical use.

In *Avnet,* this court upheld the Commission's determination that the relevant product market consisted solely of new automotive electrical units and excluded rebuilt and reconditioned units, the prices of which varied between 25 and 50 percent below that of new units. This court found that the Commission had satisfied its initial burden on the market issue since there was an "absence of any substantial interaction in price between the two lines." 511 F.2d at 77. Unlike in *Avnet,* here the record does not disclose clearly separate price groupings based on quality distinctions, but rather shows substantial price overlap between so-called "do-it-yourself" and "professional" items. In support of its contention, Beatrice cites a page of a recent Sears, Roebuck & Company catalog advertising "Homeowner Brushes" ranging in price from $4.55 for a four-inch nylon brush to $1.70 for a two-inch nylon brush and "Professional Brushes" priced from $5.67 for a four-inch nylon model to a $2.55 for a two-inch nylon brush. Beatrice has failed to show a significant distinction in the use of a "Homeowner" four-inch brush and a "Professional" two-inch brush which would warrant their placement in separate lines of commerce. To say that these brushes do not compete is to strain the antitrust concept of line of commerce too far. In addition to this lack of distinct price groupings, the record in the instant case does not disclose the same absence of price interaction between differently priced items as was present in *Avnet.*

In *Spalding,* which involved the merger of two athletic goods manufacturers, the Third Circuit upheld the Commission's determination that the manufacture and sale of low-priced athletic products involved an entirely different market from the production and sale of higher-priced, higher-quality athletic goods. The higher-priced lines of athletic goods were found to compose a distinct market due to their peculiar characteristics and uses, namely: the superior labor and raw materials used in their manufacture, and their particular suitability for use in organized competition. In the instant case, Beatrice has failed to demonstrate the presence of either of these factors in relation to the "professional" line of brushes and rollers. Specifically, the record does not support any contention that higher-priced brushes and rollers are particularly suitable for uses in which lower-priced articles are unacceptable.

Furthermore, the record does not support Beatrice's claim that lower-priced and higher-priced items are marketed and sold to distinct groups of customers. The record discloses that both lower and higher-priced brushes and rollers are distributed through the same types of firms (department, food, variety, hardware, and paint stores) and made available to the same customers. Hence, Beatrice's market attack based on supposed price/quality distinctions in the products Tip Top and Essex manufacture must be rejected as being "unrealistic." See *Brown Shoe, supra,* 370 U.S. at 326, 82 S.Ct. 1502.

## B.

Beatrice does not contend that the combination of firms with market shares such as are present in the instant case does not support a finding of illegality under section 7. See, e. g., *United States v. Von's Grocery Company,* 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966). Rather, Beatrice advances two basic arguments attacking the Commission's finding of concentration. First, Beatrice quarrels with the accuracy of the figures underlying the finding of concentration, arguing that the data used in the determination are suspect for several reasons. Second, Beatrice contends that concentration within the meaning of section 7 cannot be found as a matter of law unless the record demonstrates that the number of competitors in the relevant market is decreasing.

## 1.

In the instant case, the universe figures for total shipments by manufacturers in the relevant markets were obtained directly from published Census reports: the 1967 Census of Manufacturers and the Annual

Surveys of Manufacturers for 1968 and 1969. Standard Industrial Code 39912 and its subcategories cover shipments of paint brushes and rollers and no other extraneous products. Market shares were obtained by dividing shipments of individual companies by the universe figures obtained from the census reports. Shipments of individual firms were obtained through interviews and inquiries by a Commission economist who contacted companies known to be in the relevant market. Those companies were asked to list 12 leading companies in the brush-and-roller market. A request for shipment figures was then made of those firms. Each of these companies was also asked to list what it believed to be the 12 leading firms in the market. Any company listed in more than one response was subsequently sent a similar inquiry regarding shipment figures. Twenty-eight firms were eventually surveyed through this process.

▮ Beatrice contends that the Commission's method of data compilation was flawed and resulted in incomplete data upon which to base its determination of concentration. First, Beatrice argues that the data is incomplete in that it covers only the years 1967 through 1969 and not 1970, the year in which the Essex acquisition took place. We fail to find any significance in such a fact. The Essex acquisition took place in July of 1970 and thus the 1969 data was the last complete data available. Beatrice does not contend that the 1970 data would counter or detract in any way from the conclusion of the Commission that there was rising concentration in the relevant markets at the time of the Essex acquisition. Cf. *Brown Shoe, supra,* 370 U.S. 343 n.70, 82 S.Ct. 1502. Second, Beatrice argues that the universe figures taken from the census reports are incomplete because the census report categories used by the Commission report only shipment figures from firms where brushes and rollers constitute the primary product of the firm and not the secondary product. Thus, Beatrice contends, the data employed by the Commission does not portray an accurate picture of the universe. The record, taken as a whole, however, indicates the contrary. The legend accompanying the particular census report in question states that it "includes quantities and value of the products reported not only by establishments classified in this industry but also by establishments classified in other industries, and shipping these products as 'secondary' products." Although there appears to be a conflict in the oral testimony on the subject, viewing the record as a whole, as we must under *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), we believe that the census report categories in question supplied as accurate data as possible for computing universe figures.[7]

Pointing out that the administrative law judge found that Tip Top was an "assembler" of rollers as opposed to a "manufacturer" of rollers, Beatrice argues that it was unfair to align Tip Top as a "manufacturer" in direct competition with Essex; or if the Commission aligned Essex as an "assembler," it was unfair to not include other "assemblers" in the Commission's survey. We believe that this argument attempts to read a critical distinction between an "assembler" and a "manufacturer" which does not exist for the purposes of this case. Both an "assembler" of parts manufactured by others and a "manufacturer" of rollers from raw materials were treated identically by the Commission in its survey and data compilation and the relevant figures obtained from the census reports included shipments of both. Beatrice's contention that Tip Top was the only assembler surveyed is of little significance since it was provided ample opportunity to subpoena any firms, including "assemblers," whose shipment figures Beatrice wished to bring to the attention of the law judge and the Commission. The Commission's survey was utilized

---

7. Thus the record does not support Beatrice's contention that the Commission's counsel intentionally excluded from their figures production of brushes and rollers by paint companies. Any such production would have been included in the census figures and any large competitors in the paint companies would have been, and in fact were, surveyed.

to determine the leading firms in the market. Beatrice was apparently unsuccessful in pointing out any other "assembler" among those leaders.

The method employed by the Commission's staff to compile data in the instant case was satisfactory and resulted in obtaining as accurate a portrayal of the realities of the marketplace as could reasonably be expected. Although Beatrice may point to various technical flaws in the gathering of the data, "in cases of this type precision in detail is less important than the accuracy of the broad picture presented." *Brown Shoe, supra,* 370 U.S. at 342 n.69, 82 S.Ct. at 1533.

### 2.

Beatrice next argues that the Commission erred in finding concentration in the relevant markets without any analysis of the total number of competitors. Beatrice contends that the Commission's failure to determine the precise number of manufacturers in 1950 and 1970 somehow undermines its decision. Relying on the Supreme Court's decision in *United States v. Von's Grocery Company,* 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966), Beatrice argues that concentration cannot be found in a market unless the record demonstrates that the number of competitors is decreasing. In the instant case, Beatrice contends that the number of competitors has increased over the years, thus precluding a finding of concentration. We disagree; neither *Von's Grocery* nor any other case conditions the finding of a section 7 violation on the presence of a continuous decline in the number of competitors in a market. Merely because the market under scrutiny in *Von's Grocery* was "characterized by a long and continuous trend toward fewer and fewer owner-competitors," *id.* at 278, 86 S.Ct. at 1482, does not require the presence of that characteristic in a market before concentration and a violation of section 7 may be found. See, e. g., *FTC v. Proctor & Gamble Company,* 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967). Even if the market here had more competitors in 1970

than it had in 1950, as Beatrice contends, the record clearly demonstrates that the acquisition of Essex aggravated an already concentrated market. Compare *Ford Motor Company v. United States,* 405 U.S. 562, 570, 92 S.Ct. 1142, 31 L.Ed.2d 492 (1972). A merger "which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." *United States v. Philadelphia National Bank,* 374 U.S. 321, 363, 83 S.Ct. 1715, 1741, 10 L.Ed.2d 915 (1963).

### C.

In 1969, the EZ Paintr Corporation, the leading manufacturer of rollers in the nation (by the Commission's estimate), acquired American Brush Corporation and, in 1970, acquired Masterset Brushes, Inc. and King Paint Roller Company. The Commission filed a complaint against these acquisitions nearly contemporaneously with the filing of the complaint in the instant case. The EZ Paintr action, however, was terminated by the entry of a consent decree wherein EZ agreed to divest all of the paint roller facilities it acquired. Beatrice argues that "the conclusion is inescapable" that "if EZ's acquisitions and their resulting affect [sic] on concentration are lawful, so must Petitioner's acquisition of Essex be lawful." The entering of a consent decree, however, is not a decision on the merits and therefore does not adjudicate the legality of any action by a party thereto. Nor is a consent decree a controlling precedent for later Commission action. Cf. *Montgomery Ward & Co. v. FTC,* 379 F.2d 666, 671–72 (7th Cir. 1967). Furthermore, the Commission's findings of concentration in the instant case are not "based, in large part, on conduct condoned by the Commission itself in its *EZ Paintr* action," as Beatrice maintains. As discussed above, the Commission based its analysis in the instant case on data from the years 1967, 1968, and 1969 only and not

1970. Therefore, the only aspect of the EZ Paintr acquisitions that would have played a role in the data analyzed in the instant case would have been the paint brush manufacturing capability of American Brush Corporation which EZ was permitted to retain. Any effect on the concentration found in the instant case due to this, we believe, is not significant enough to taint the Commission's decision or to "bar" its finding of illegality with respect to Beatrice's acquisition of Essex.

### D.

■ Beatrice renews various arguments with regard to numerous erroneous evidentiary rulings by the administrative law judge. Those rulings involved leading questions, best evidence, refreshing recollection and other objections sustained by the law judge which Beatrice maintains prevented it from receiving a fair hearing. The Commission found no prejudice in the rulings since offers of proof were permitted in each instance and the Commission accepted and considered the offers as evidence of record. The Commission also registered its disapproval with many of the law judge's rulings and in light of this reprimand we need not further comment.[8]

■ Prior to the hearing, Beatrice requested the issuance of subpoenas *duces tecum* to 383 companies, a request denied by the law judge. During the trial, Beatrice requested and received 10 subpoenas *duces tecum* for each category of companies manufacturing rollers and brushes, sprayers, and aerosols. The law judge informed Beatrice that he would allow the subpoena of any firm believed to be an important factor in the relevant markets which were overlooked by the Commission's survey; he indicated that if Beatrice made a proper showing, additional subpoenas would be granted. Beatrice thereafter sought to subpoena nearly 100 firms. The law judge

refused to grant the subpoenas and now Beatrice contends that, by failing to do so, the law judge denied it a fair hearing. We disagree. As this court stated in *Papercraft Corp. v. FTC*, 472 F.2d 927, 930 (7th Cir. 1973), "the Commission may properly require a showing of need . . . before it will issue [a large number of] subpoenas *duces tecum* for the purpose of establishing the precise contours of the relevant market in a § 7 case." With the 10 subpoenas granted it for the brush-and-roller market, Beatrice was unable to present any firm which remotely approached the top eight firms found by the Commission's counsel. Hence, we agree with the Commission's counsel that the law judge gave Beatrice adequate opportunity to discover the structure of the industry and the necessary "showing of need" was not made to warrant the issuance of a large number of additional subpoenas.

### E.

■ The fourth paragraph of the order of the Commission prohibits Beatrice from acquiring any firm "engaged in the manufacture or sale of manually powered paint applicators." Beatrice contends that this order is overly broad and not reasonably related to the alleged violation. Beatrice maintains that the unlawful conduct in the instant case was horizontal in nature but that the order is aimed at vertical as well as horizontal integration. Beatrice's argument centers on the order's language "manufacture *or sale*." (Emphasis added.) Thus, Beatrice interprets the order to ban not only the acquisition of manufacturers of brushes or rollers, but also firms which do not manufacture them but rather only sell brushes or rollers manufactured by other firms. The complaint in the instant case alleged that both Tip Top and Essex engaged in the "manufacture, sale, distribution" of products in the brush-and-roller market. Thus the instant case centered

---

**8.** Beatrice argues for the first time on appeal that the administrative law judge denied it the right to examine one of the Commission's witnesses with respect to the company's comparative strength in the "professional" and "do-it-

yourself" fields. As a reviewing court, we cannot entertain questions not previously raised before the agency. *Lloyd A. Fry Roofing Co. v. FTC*, 371 F.2d 277, 286 (7th Cir. 1966).

upon those firms which manufactured such products, but who, of course, sell and distribute their products to others for ultimate sale to consumers. The relevant market for the instant case did not include those firms which purchased brushes-and-rollers and then resold them to the consuming public. The Commission's order, however, appears to include these latter firms. The brief of the Commission's counsel seems to interpret the order to pertain only to manufacturers in the relevant lines of commerce. Nevertheless, to insure that the order is reasonably related to the violations found, the words "or sale" are stricken from the fourth paragraph of the order. Compare *Seeburg Corp. v. FTC*, 425 F.2d 124, 129–30 (6th Cir. 1970); *Abex Corp. v. FTC*, 420 F.2d 928, 933 (6th Cir. 1970), *cert. denied*, 400 U.S. 865, 91 S.Ct. 98, 27 L.Ed.2d 103 (1970). In all other respects, we approve the order.

### III.

For the reasons stated above, the order of the Federal Trade Commission, as modified, is affirmed.