Raymond S. O'RIORDAN, Plaintiff,

v.

**LONG ISLAND BOARD OF REALTORS, INC. et al., Defendants.**

**No. CV–85–1348.**

United States District Court,
E.D. New York.

Sept. 19, 1988.

Armstrong & Butterfield, Huntington, N.Y., for plaintiff; by Kenneth Butterfield.

DeGraff Foy Conway Holt–Harris & Mealey, Albany, N.Y., for defendant NYS Ass'n of Realtors; by Stephen R. Sloan, Michael T. Walkender.

Goldson & Goldson, North Babylon, N.Y., for defendants Nat. Ass'n of Realtors, L.I. Bd. of Realtors and Multiple Listing Service of Long Island; Howard Goldson, Robert Butters.

## MEMORANDUM AND ORDER

SIFTON, District Judge.

Plaintiff brings this action under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; sections 4 and 26 of the Clayton Act, 15 U.S.C. §§ 15 and 27; the Donnelly Act, New York General Business Law § 340; and the common law of restraint of trade. This Court has jurisdiction over plaintiff's claim pursuant to 28 U.S.C. §§ 1331 and 1332 and 15 U.S.C. §§ 15 and 27. The gravamen of plaintiff's complaint is that the defendant Multiple Listing Service of Long Island, Inc. ("MLSLI") will not permit him to join that organization unless he becomes a member of the Long Island Board of Realtors ("LIBOR")

The matter is now before me on the motion of plaintiff for partial summary judgment, and defendants' cross-motions for summary judgment, both made pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff wishes to have summary judgment entered as to defendants' liability, leaving damages to be decided by a jury. Because there are no genuine disputes as to any material issue of fact and defendants are entitled to judgment as a matter of law, defendants' motions are granted.

As set forth below, the facts are taken from the statements submitted by the parties pursuant to Rule 3(b) of the Civil Rules for the Southern and Eastern Districts of New York and the affidavits submitted in support of their respective positions on these motions. Rule 3(g) requires parties moving pursuant to Rule 56 to set forth the facts that are not in dispute and the parties opposing a Rule 56 motion to set forth the material facts that are in dispute. Here, the 3(g) statements display an almost complete agreement as to the facts of this case. For the most part, the dispute concerns the legal consequences of the facts which both sides agree exist. Except where noted, the facts are undisputed.

The defendant National Association of Realtors, Inc. ("NAR")[1] is an association of real estate brokers and salesmen founded in 1968 to promote the common interests of its members and to provide a forum for settling disputes among them. The NAR has promulgated a code of ethics, and its members agree to arbitrate disputes

---

[1] In addition to the parties described below, plaintiff has sued 5,000 "John and Jane Does" who are described in the caption as being members of NAR, the New York Association of Realtors, Inc., the Long Island Board of Realtors, Inc., and the Multiple Listing Service of Long Island, Inc., who are also members of a real estate relocation franchise or referral organization. Although discovery has been completed, there is no indication that plaintiff has identified or served these defendants.

among themselves before NAR and that their arbitration will be governed by the code of ethics. The NAR is the owner of the federally registered service marks "Realtor" and "Realtors." The NAR also maintains a Political Action Committee.

The defendant New York State Association of Realtors ("NYSAR") is a state-wide trade association of real estate brokers operating under the auspicies of NAR. LIBOR is a trade association of real estate brokers and salesmen in Queens, Nassau, and part of Suffolk Counties in New York operating under the NAR. LIBOR pays dues to both NYSAR and NAR, and a certain portion of the fees paid by LIBOR members are turned over to the state and national associations.

In 1974, NAR adopted a fee schedule pursuant to which real estate brokers and their salesmen could become NAR members as Realtors and Realtor Associates, respectively. Realtors pay an amount based on their office size, and Realtor Associates pay a separate fee. The payments made by Realtor Associates are distinct from those made by Realtors so as to maintain the position of the salesmen-Realtor Associates as independent contractors for tax purposes. To ensure that an office is neither encouraged nor discouraged from having its salesmen become Realtor Associates, the dues payable by a broker are reduced by the amount equal to those dues payable by salesmen who were members of the NAR.

MLSLI is a wholly-owned subsidiary of LIBOR. A multiple listing service ("MLS") is a means by which a broker offers a sub-agency to all those participating in the listing service for real estate properties available for sale from the originating broker. Properties listed in the MLSLI lists may then be offered by other participants at the commission agreed upon between the seller and the originating broker. NAR does not allow members among themselves to fix commissions or fees members will charge. Furthermore, members of MLSLI are free to sell properties through other channels if they so chose.

One of the requirements for membership in MLSLI is membership in LIBOR. One consequence of this requirement and its stated rationale is that all members of MLSLI will be subject to the arbitration rules and the code of ethics of NAR. Thus, any disputes that arise out of the sub-agency relation created as a result of the operation of the MLS system are subject to mandatory arbitration under the NAR ethical code.

By a consent decree entered in a proceeding brought against LIBOR by the Department of Justice, *United States v. Long Island Board of Realtors, Inc.*, CV-70-1418 (E.D.N.Y. June 29, 1971), the LIBOR agreed that it would not erect any unreasonable barrier to participation in MLSLI. Since 1971, no licensed real estate broker or salesman who has applied has been denied membership in LIBOR, and no LIBOR member who has applied has been denied membership in MLSLI. Defendants have submitted letters from the Department of Justice to the effect that the current membership requirements for MLSLI membership are considered by the Department to be reasonable and non-discriminatory.

Until 1971, MLSLI was part of LIBOR and operated under the name Multiple Listing Committee. In 1970, LIBOR was sued in Supreme Court, Nassau County, in a proceeding raising an issue as to its status under state tax laws. In 1971, the court held that LIBOR could not operate directly an MLS and still maintain its status as a not-for-profit, tax-exempt trade organization. As a result, LIBOR set up MLSLI as a wholly-owned subsidiary.

It is not disputed that the promise of mandatory arbitration as well as the educational opportunities afforded, together with the multiple listing service, makes LIBOR membership attractive to many; and its membership has, in fact, grown over the years. At present, LIBOR dues are $365 per year, and membership in MLSLI costs $400 per year.

Plaintiff, Raymond O'Riordan, is a licensed real estate broker and salesman. He has sold and listed real estate for sale in Huntington in the County of Suffolk

since 1951. In the early 1960's, plaintiff and fifteen other real estate brokers formed Huntington North Shore Multiple Listings ("HNSML"). This organization was successful, and plaintiff operated his real estate business successfully.

Starting in 1973, members of HNSML started to leave that organization for LIBOR and MLSLI, and by 1974 HNSML had declined to the point where it was not longer an effective organization. The members disbanded and formed a new organization called Huntington North Shore Homeowner Brokers. That organization continued until 1987.

From 1976 through 1986, MLSLI offered 400,000 listings through the MLS system, of which 35% have resulted in sales. MLSLI is the major source of listings in Nassau and Queens Counties. MLSLI brokers sell to customers outside of New York as well. Plaintiff claims that brokers who are not members of LIBOR cannot get access to MLSLI listings. Any MLS member is, however, free to deal with plaintiff or any non-member of MLS.

In 1973, plaintiff joined LIBOR and paid the membership dues required, complaining, however, of the requirement that he join LIBOR in order to be a member of MLSLI. In 1984, plaintiff ended his relation with LIBOR and applied for membership in MLSLI. He was denied membership solely because he was not a LIBOR member.

Though not in his 3(g) statement, plaintiff refers to the following additional facts in his memoranda of law apparently drawn from defendants' answers to plaintiff's interrogatories which are, however, not on file. Prior to 1972, plaintiff sold an average of ten residential properties per year. Subsequently, his sales declined to three houses per year, and plaintiff "experienced a steady decline of listings in the open market." Plaintiff estimates his loss of earnings at $554,400. This calculation is based on a 6% commission on seven houses a year, each priced at $120,000.

In his complaint, plaintiff alleges violations of the Donnelly Act, Sherman Act § 1 in the form of a "naked restraint of trade," an alleged tying agreement, a boycott, division of markets, allocation of customers, elimination of competition, Sherman Act § 2, attempted monopolization, and New York common law for wrongfully interfering with plaintiff's profession. Plaintiff seeks a declaratory judgment against defendants proclaiming their conduct in violation of the Sherman Act §§ 1 and 2, various items of injunctive relief, and $2,100,000 in damages, plus costs and fees.

## DISCUSSION

Rule 56 provides that summary judgment shall be granted in cases in which there is no genuine dispute as to any material issue of fact and the movant is entitled to judgment as a matter of law.

"The movant bears the initial burden of demonstrating an absence of a genuine issue as to any material fact. This may consist of simply pointing out that plaintiff has failed to present any evidence to establish a necessary element of the cause of action. In response, the non-moving party must set forth specific facts showing a genuine issue for trial. While the moving party must show more than a metaphysical doubt as to material facts, all inferences must be drawn in favor of the non-moving party. However, the Supreme Court has stated that anti-trust law limits the range of permissible inferences from ambiguous evidence in [an anti-trust] case." *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir.1987) (citations omitted).

Both the Supreme Court and the Court of Appeals for the Second Circuit have encouraged the use of summary judgment where appropriate in anti-trust cases. However,

"while the Supreme Court has indicated that trial courts should draw only reasonable inferences in favor of the non-moving party viewing the evidence as a whole, and while some assessing of the evidence is necessary in order to determine rationally what inferences are reasonable and therefore permissible, it is evident that the question what weight should be assigned to competing infer-

ences remains within the province of the factfinder at trial."

*Belfiore v. New York Times,* 826 F.2d 177, 180 (2d Cir.1987), *quoting Apex Oil, supra,* at 246 (citation omitted). With these principles as a guide, plaintiff's claims will be considered.

### Anti–Trust Damage

Section 1 of the Sherman Act states in part:

> "Every contract, combination in the form of trust or otherwise, in restraint of trade or commerce among the several states is declared illegal."

Private persons are given a cause of action under the Sherman Act by section 4 of the Clayton Act, which provides for a suit to recover treble damages by any person injured in his business or property by the violation of the anti-trust laws. Section 16 of the Clayton Act allows injured parties to sue for injunctive relief.

### Illegal Boycott

Section 1 of the Sherman Act prevents every combination or conspiracy on restraint of trade. The statute has been interpreted to prevent only unreasonable restraint. *Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Where, however, a practice has no redeeming virtue and is purely anti-competitive, it will be considered *per se* unreasonable without further inquiry. *Broadcast Music, Inc. v. Columbia Broadcasting Co.,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed. 2d 1 (1979).

Group boycotts are among the categories of activity which the courts have considered *per se* illegal. *United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). In this case, plaintiff contends that the MLSLI constitutes a group boycott since it will provide its multiple listing service only to those real estate dealers who are members. However, where professional or trade organizations are involved, courts have been reluctant to apply a *per se* analysis to such practices because the pro-competitive aspects of a trade organization may outweigh the negative consequences it has on competition. *Fashion Originators Guild of America v. Federal Trade Comm'n,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941).

In the leading case on the anti-trust aspects of an MLS, *United States v. Realty Multi–List, Inc.,* 629 F.2d 1351 (5th Cir. 1980), the court declined to apply the per se analysis to a MLS and found that the pro-competitive aspects of an MLS were worthy of consideration under the rule of reason. *Id.,* at 1367. The MLS functions like an exchange and provides wide dissemination of market information. *See* Austin, *Real Estate Boards and Multiple Listing Systems as Restraints of Trade,* 70 Columbia L.Rev. 1325, 1353–54 (1970). The court noted that anti-trust laws must allow reasonable ancillary restraints necessary to accomplish this pro-competitive objective. 629 F.2d at 1368. Indeed, there appears no federal case in which a court has applied a *per se* analysis to an MLS.

In examining the MLS in *Realty Multi–List,* the court looked to see if it had the requisite market power to harm competition through exclusion of prospective participants, 629 F.2d at 1371, and then looked to see whether restrictions on the MLS membership could promote or hinder competition—the question being whether the "criteria which gave it power to exclude brokers have legitimate justification in the competitive needs of the association." *Id.,* at 1376.

According to the *Multi–List* court, an MLS may take steps reasonably calculated to ensure that its members will not be endangered legally or ethically by the brokers with whom they enter into a multiple listing agreement. *Id.,* at 1377.

Here, defendants have articulated a valid pro-competitive reason for requiring LIBOR membership as a prerequisite to MLS membership. LIBOR provides a set of ethical rules and an arbitral forum for enforcing those rules. The need for arbitration among members of a market place has been recognized by courts in this Circuit. *See Drayer v. Krasner,* 572 F.2d 348, 359 (2d Cir.1978). Furthermore, there is nothing arbitrary or discriminatory about the

requirements for LIBOR membership. Fees have not been shown to have been unreasonably related to the costs of the organization or designed to exclude plaintiff or anyone else. All licensed real estate brokers who have applied for LIBOR membership have been admitted, and all LIBOR members who have applied for MLSLI membership have been admitted.

Plaintiff has submitted evidence of a consent judgment from the District of Oregon in which an MLS agreed not to require membership in a board of realtors. *United States v. Multiple Listing Service*, No. CV–72–68 (D.Ore). That decree, however, does not establish that the requirement of LIBOR membership for access to any MLS is unreasonable. Since there is nothing in the record from which a jury could infer that the requirement of LIBOR membership is unreasonable, plaintiff's claims of illegal boycott and concerted refusal to deal must fail.

This result is in accord with that reached by a number of other courts. Where an MLS has merely required membership in a board of realtors numerous courts have refused to find an anti-trust violation. *See Brown v. Indianapolis Bd. of Realtors*, 1977–1 Trade Cas. (CCH) ¶ 61,435 (S.D.Ind. May 6, 1977) [1977 WL 1405]; *Martin–Trigona v. National Ass'n of Realtors*, 1978–1 Trade Cas. (CCH) ¶ 61,915 (N.D.Ill. 1978) [1978 WL 1310]; *Pomanowski v. Monmouth County Bd. of Realtors*, 89 N.J. 306, 446 A.2d 83, 92 (1982); *State v. Cedar Rapids Bd. of Realtors*, 300 N.W.2d 127, 131 (Iowa 1981); *Grempler v. Multiple Listing Service of Harford Co., Inc.*, 258 Md. 419, 266 A.2d 1, 7 (App.1970).

Only one jurisdiction, California, has found the requirement of board of realtor membership for membership in an MLS to be unreasonable. *People v. Nat'l Ass'n of Realtors*, 155 Cal.App.3d 578, 202 Cal.Rptr. 243 (1984). In that case, the court employed a tying analysis which, as noted below, does not accord with federal law. Here, the record is devoid of any evidence that would lead one to conclude that the requirement of LIBOR membership is unreasonable in the case before the Court.

*Tying*

Plaintiff argues that the LIBOR membership requirement constitutes an illegal tying agreement. Tying consists of using market power in one product or service (here, the MLSLI), called the tying product, to force consumers to purchase another product or service (LIBOR membership) called the tied product. There are five elements to a claim of tying as a § 1 violation: (1) two distinct products, (2) evidence of coercion, (3) sufficient economic power in the market for the tying product, (4) anti-competitive effect in the tied market, and (5) involvement of a not insubstantial amount of interstate commerce. *Power Test Petroleum Distributors v. Calcu Gas, Inc.*, 754 F.2d 91, 96 (2d Cir.1985); *Nassau–Suffolk Ice Cream v. Integrated Resources*, 114 F.R.D. 684 (S.D.N.Y.1987).

Recently, the Court of Appeals for the First Circuit upheld the grant of a directed verdict on a similar tying claim. *Wells Real Estate v. Greater Lowell Bd. of Realtors, supra*, 850 F.2d 803, 815. The court found that the plaintiff had failed to demonstrate a market for membership in real estate boards that might have been affected by the tying arrangement. Absent proof that the purchaser would have bought membership in some other board, there could no proof of an anti-competitive effect. *Id., citing Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984).

Here, as in *Wells*, plaintiff has made no showing that there was any sort of market in boards of real estate dealers and has made no showing of anti-competitive results.

Furthermore, as the *Wells* court noted, it is doubtful that board membership and MLS membership constitute two separate products. At 815. As the court noted, no federal court has held that an MLS constitutes a tying arrangement. *Id.* The MLS provides membership to the board, which benefits from increased numbers and makes it more attractive to potential members. On the other hand, the board provides the MLS with its members and arbi-

tral services, which make the MLS more attractive. Thus, the board and the MLS are, in fact, one product for the purpose of tying analysis. *Hirsh v. Martindale-Hubbell, Inc.,* 674 F.2d 1343 (9th Cir.1982).

In *Hirsh,* the court was faced with a situation where the purchase of a directory of lawyers was requisite to the purchase of advertising in the directory. The court found that the directory's effectiveness was dependent on the number of lawyers who advertised in it, and advertisements depended on the number of lawyers who owned the directory. Thus, the directory and the advertisements constituted a single system. *Id.,* at 1347. *See also Principe v. McDonald's Corp.,* 631 F.2d 303, 311 (4th Cir.1980).

Here, what LIBOR and its wholly-owned subsidiary, MLSLI, are offering is a single system of marketing real estate. It is a single product and does not fall within the tying analysis.

### Other Federal Claims

■ Plaintiff's claims of illegal boycott and tying are the only two he has defended seriously on this motion for summary judgment. He has, however, made numerous other arguments which may be dealt with in short order.

Plaintiff's claims of price fixing, market allocation, customer allocation, and elimination of competition among brokers simply lack evidence to support them. Furthermore, these are not the sort of anti-trust violations for which plaintiff can claim he suffered an anti-trust injury. *See Cargill v. Monfort of Colo., Inc.,* 479 U.S. 104, 107 S.Ct. 484, 489, 93 L.Ed.2d 427 (1986); *Brunswick v. Pueblo Bowl-O-Mat,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); *National Ass'n of Pharmaceutical Mfgrs., supra,* 850 F.2d 904, 912 (2nd Cir.1988). To the extent that plaintiff raises a claim of conspiracy to restrain trade, even if it were to be assumed that the members of a wholly-owned subsidiary of one corporation could conspire with that corporation, *see Fuchs Sugars & Syrups Inc. v. Amstar Corp.,* 602 F.2d 1025, 1031

n. 5 (2d Cir.), *cert. denied,* 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172 (1979), plaintiff has not put forth the quantum of proof necessary to carry a claim of conspiracy past the summary judgment stage. *See Matsushita Electric Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Belfiore supra,* 826 F.2d at 183. Nor has plaintiff shown what the restraint of trade that is the object of the conspiracy might be.

Finally, plaintiff's claim of attempted monopolization under § 2 of the Sherman Act [2] must fail for want of any evidence as to the identity of the relevant market. *See Belfiore, supra,* at 180. Nor has plaintiff made a showing of the second element, that whatever power defendants may have, was acquired willfully as opposed to being the outgrowth of a superior business product. *Id.*

### State Law Claims

■ Plaintiff has also made claims based on the Donnelly Act and the common law of restraint of trade. This Court has jurisdiction over these claims as a result of pendent jurisdiction. Here, however, the causes of action on which the state law claims are pendent have been dismissed. It is appropriate, therefore, to dismiss plaintiff's state law claims for want of subject matter jurisdiction. *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Robison v. VIA,* 821 F.2d 913 (2d Cir.1987).

In all events, the Donnelly Act, GBL § 340, is the New York equivalent of the Sherman Act. It has been interpreted in light of the Sherman Act. *See Duhamel v. Multiple Listing Service,* 108 Misc.2d 67, 436 N.Y.S.2d 922, 925 (Sup.Ct. Dutchess Co. 1981); *see also State v. Mobil Oil Corp.,* 38 N.Y.2d 460, 381 N.Y.S.2d 426, 344 N.E.2d 357 (1975). Indeed, the courts of New York have been more willing to allow practices under the Donnelly Act than have federal courts in applying the Sherman Act. *Compare Duhamel, supra,* (upholding MLS provision forbidding cer-

---

**2.** The complaint states § 1.

**118**

tain types of advertising) *with Cantor v. Multiple Listing Service*, 568 F.Supp. 424 (S.D.N.Y.1983) (striking down such a provision). There is no basis for believing that the courts of New York would find anything in the record before me as violative of the Donnelly Act, nor does anything on the record before me indicate a violation of the common law of restraint of trade. Plaintiff has not shown that he was prevented unreasonably from participating in his trade or profession.

For the reasons set forth above, defendants' motions for summary judgment are granted.

The Clerk is directed to enter judgment dismissing the complaint and to mail a copy of the within to all parties.

SO ORDERED.