FLAUM, Chief Judge.
Plaintiff-Appellant Jay Reifert claims that the defendants violated the Sherman Act by tying access to a real estate multi-listing service (“MLS”) to membership in a Realtors Association. The district court granted summary judgment for all defendants in this case, finding no competition in the tied market and therefore, no antitrust violation.
For the following reasons, we now affirm the judgment of the district court.
I. Background
Realtors Association of South Central Wisconsin, Inc. (“RASCW”) is a real estate trade association. Its members are real estate agents and appraisers in and around Madison, Wisconsin. RASCW offers a variety of products and services to its members, including lobbying, social functions, courses, referral programs, contract forms, conventions, publications, and legal information.
RASCW is associated with the Wisconsin Realtors Association and the National Association of Realtors (“NAR”). When a person pays membership dues to an association affiliated with NAR, that person becomes a member of NAR. Normally, *315 Realtors Association[1] memberships are packaged as a group including local, state, and NAR memberships.
RASCW owns 100% of the stock in the South Central Wisconsin MLS Corp. (“SCWMLS”). The MLS or multiple listing service is a computerized database of homes and properties listed for sale by SCWMLS participants in south-central Wisconsin. Access to this multiple listing service is a necessity for real estate agents and appraisers in this area. Virtually all active residential real estate agents in the region subscribe to SCWMLS. Users are charged a quarterly fee to gain access to the full database and must be a member of a Realtors Association affiliated with NAR. The Realtors Association membership requirement has existed for more than fifty years. Generally, any licensed real estate professional who agrees to abide by the NAR Code of Ethics and pays the applicable fees is admitted.
Article 16 of NAR’s Code of Ethics contains a “non-solicitation” rule. This article and the related standards of practice prohibit members from inducing sellers to breach listing contracts, advising sellers of superior services or prices during the time they are under contract with another Realtor, and using “information received through a Multiple Listing Service ... to target clients of other Realtors®.”
A member-elected board of directors sets dues for RASCW. Fees for SCWMLS are also set by members elected to a board of directors. Both organizations set their fees solely to cover operational costs, with no profit-making intent. Annual dues to join the NAR, Wisconsin Association of Realtors, and RASCW are approximately $449 a year.
The plaintiff, Jay Reifert, brings three claims against SCWMLS, RASCW, and the directors of SCWMLS. First, he alleges that SCWMLS unlawfully ties its services to RASCW. Second, Reifert alleges that by conditioning access to MLS service on membership in RASCW, an unlawful group boycott has occurred. Finally, Reifert alleges that Article 16 of the NAR Code of Ethics violates the Section I of the Sherman Act, 16 U.S.C. § 1, by prohibiting competition.
Reifert, is a residential real estate broker, exclusively representing buyers of real estate in south central Wisconsin. Reifert has been a member of RASCW (or its predecessor) and a participant in SCWMLS (or its predecessor) since 1988. Reifert belongs to the National Association of Exclusive Buyer’s Agents (“NAEBA”) and has no desire to maintain membership in RASCW or the state and national Association of Realtors. Reifert objects to the fees he is forced to pay for unwanted services and the Code of Ethics he must follow to maintain his membership in RASCW and NAR.
Reifert claims that during the four years at issue in this action, he has paid dues in excess of $2000 for an unwanted RASCW membership to maintain his SCWMLS access. During the relevant four-year period, there have been approximately 2,079 annual and 5,600 total SCWMLS participants.
To support an antitrust action, a plaintiff must demonstrate that the defendant’s actions have restrained competition. Section I of the Sherman Act states, “Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several *316 States ... is declared to be illegal.” 15 U.S.C. § 1. The Supreme Court has long recognized that Congress intended to outlaw only “unreasonable restraints,” not all contracts in restraint of trade. See State Oil Co. v. Khan, 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) (citations omitted). The Clayton Act allows for private suits by individuals injured by violations of antitrust laws. See 15 U.S.C. §§ 15, 26.
On August 25, 2005, the district court granted summary judgment to the defendants and denied summary judgment to the plaintiff. A tying arrangement violates federal antitrust statutes if it has a substantial effect on interstate commerce. The district court found that “there is insufficient evidence for a fact finder to find that a tie between the defendant’s multiple listing service and Realtor membership has had an effect on interstate commerce as that element has been defined by the Supreme Court.”
As to Reifert’s group boycott claim, the district court again found that the plaintiff had failed to prove any anticompetitive effects resulting from the tying of Realtors Association memberships to MLS services. Accordingly, the district court granted summary judgment to the defendants.
II. Discussion
We review a district court’s grant of summary judgment de novo, taking all facts in the light most favorable to the non-moving party. See, e.g., McCoy v. Harrison, 341 F.3d 600, 604 (7th Cir.2003) (citations omitted). An award of summary judgment is proper when “there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
A. Tying Claim
Reifert claims that the defendants have engaged in an unlawful tying arrangement by limiting SCWMLS access to members of a Relators Association. Thus, the alleged “tying product” is SCWMLS and the alleged “tied product” is membership in a Realtors Association.
In determining whether a violation of Section I of the Sherman Act, 15 U.S.C. § 1, has occurred as a result of a tie between two products or services, this Court requires the plaintiff to prove four elements. See Carl Sandburg Vill. Condo. Ass’n No. 1 v. First Condo. Dev. Co., 758 F.2d 203, 208 (7th Cir.1985) (citing imposition of the “economic interest requirement ... by courts in the Second, Third, Fourth, Fifth, Sixth, Ninth, and Eleventh Circuits”).
In order to establish the per se illegality of a tying arrangement, a plaintiff must show that: (1) the tying arrangement is between two distinct products or services, (2) the defendant has sufficient economic power in the tying market to appreciably restrain free competition in the market for the tied product, and (3) a not insubstantial amount of interstate commerce is affected. [N. Pac. Ry. Co. v. United States, 356 U.S. 1, 5-6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958) ]; Moore v. Jas. H. Matthews & Co., 550 F.2d 1207, 1212 (9th Cir.1977). In addition, this circuit has held that an illegal tying arrangement will not be found where the alleged tying company has absolutely no economic interest in the sales of the tied seller, whose products are favored by the tie-in. Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc., 585 F.2d 821, 835 (7th Cir.1978), cert. denied, 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979); Warner Mgmt. Consultants, Inc. v. Data *317 Gen. Corp., 545 F.Supp. 956, 967 (N.D.Ill.1982).
Id. at 207-08.
Following this precedent, the district court correctly required Reifert to prove the following four elements of a tying violation: (1) a tie exists between two separate products; (2) the tying seller (SCWMLS) has sufficient economic power in the tying product market to restrain free competition in the tied product market (Realtors Association memberships); (3) the tie affects a not-insubstantial amount of interstate commerce in the tied product (Realtors Association memberships); and (4) the tying seller (SCWMLS) has some economic interest in the sales of the tied product (Realtors Association memberships). Id. at 207.[2]
There is no question that Reifert has satisfied the requirements for the first two elements. First, access to the multi-listing service cannot be obtained without purchasing the tied product, a Realtors Association membership. Second, SCWMLS has sufficient market power to restrain free competition in the tied product market.
SCWMLS is a unique product. Nearly every available home in the relevant geographic area is listed on the service. The near-perfect market information created by SCWMLS is the result of a requirement that members place all listings in the MLS within five days. The MLS allows individuals with access to search and filter properties based upon detailed criteria including compensation offered to buyers’ agents, detailed property information, neighborhood information, prior sales history, offers made on the property, days on the market, and the sale price of comparable homes. The features and information available through SCWMLS are not available through any other service. In addition, the MLS service targets a different audience — real estate agents and appraisers — than free listing services or newspapers. In short, it is impossible to perform the tasks of a real estate agent or appraiser in the relevant geographic area without using SCWMLS. Thus, it possesses sufficient market power to restrain competition.
The third element of the Sandburg test states that a tying arrangement violates antitrust law only if “a substantial volume of commerce is foreclosed” because of the tie. Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 16, 104 S.Ct. *318 1551, 80 L.Ed.2d 2 (1984). This element can be broken into two sub-questions: (1) Is there at least one competitor in the tied product market other than the favored seller; and (2) Is the quantity of interstate commerce affected not-insubstantial?
The district court found no competition in the allegedly tied market for Realtors Association memberships. Where there is no competition in the tied market, there can be no antitrust violation. Forcing a buyer to purchase a product he otherwise would not have purchased is insufficient to establish the foreclosure of competition. Id. (“[W]hen a purchaser is ‘forced’ to buy a product he would not have otherwise bought even from another seller in the tied product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed.”).
Despite Reifert’s desire to avoid purchasing a Realtors Association membership, without evidence of competitors in the market for services offered by the Realtors Association, there can be no foreclosure of competition. See Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc., 585 F.2d 821, 835 (7th Cir.1978); 9 Phillip E. Aree-DA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 1723a (2d ed. 2004) (“When there are no rival sellers of the tied product to be foreclosed, then the alleged tie-in might affect a substantial volume of commerce in the tied product and yet not foreclose anyone.”). The district court correctly found that despite the “laundry list of entities” submitted by the plaintiff, there were no competitors in the tied product market.
Products and services are in the same market when they are good substitutes for one another. “The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.” Brown Shoe Co. v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).
This Court requires that a plaintiff prove that products are good substitutes using economic evidence; a conclusory assumption of competition where products or services appear to be similar is insufficient. See Menasha Corp. v. News Am. Mktg. In-Store, Inc., 354 F.3d 661, 664 (7th Cir.2004). Actual data and a reasonable analysis are necessary to demonstrate that a product or service is a good substitute for another. “Economics, like the other social sciences, has its share of counterintuitive findings, so observing things that to the untutored eye seem to be substitutes need not mean that they are good substitutes.” Id.
Other federal courts have held that conditioning access to a multi-listing service on membership in a Realtors Association is not indicative of an unlawful tying arrangement. See Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors, 850 F.2d 803 (1st Cir.1988); O'Riordan v. Long Island Bd. of Realtors, Inc., 707 F.Supp. 111 (E.D.N.Y.1988); Buyer’s Corner Realty, Inc. v. No. Ky. Ass’n of Realtors, 410 F.Supp.2d 574 (E.D.Ky.2006). One federal court has held that a tied real estate association group faced competition and therefore created an unlawful tie; as explained below, however, we find that case distinguishable. See Thompson v. Metro. Multi-List, Inc., 934 F.2d 1566 (11th Cir.1991).
Reifert argues that by comparing participation in Realtors Associations in areas where MLS services are “open” to individuals who have not joined a Realtors Association with so called “closed” areas that require membership in a Realtors Association, he can demonstrate that agents have been forced to purchase Realtors As *319 sociation memberships. This comparison is unreliable, however, because it fails to speak to the central question of whether a competitor exists in this particular “closed” market and does not account for other possible explanations for the observed differences. Forcing individuals in Reifert’s position to purchase a product they do not want is not a violation of antitrust law. See Jefferson Parish Hosp. Dist. No. 2, 466 U.S. at 16, 104 S.Ct. 1551.
Even without an economic analysis, it is apparent that RASCW lacks competition. Each of the twelve organizations cited by Reifert fails to qualify as a competitor to the national or local Realtors Association:
1. Appraisal Institute (Al)covers only appraisers
2. Asian Real Estate Agent Association (AREAA) — serves a distinct ethnic community
3. Chinese American Real Estate Professionals Association (CAREPA)— serves a distinct ethnic community
4. Chinese Real Estate Association of America (CREAA) — serves a distinct ethnic community
5. Colorado Association of Exclusive Buyer Agents (CAEBA) — covers only exclusive buyer agents
6. Massachusetts Association of Buyer Agents (MABA) — covers only exclusive buyer agents
7. National Association of Exclusive Buyer Agents (NAEBA) — covers only exclusive buyer agents
8. National Association of Independent Fee Appraisers (NAIFA) — covers only appraisers
9. National Association of Hispanic Real Estate Professionals (NAH-REP) — serves a distinct ethnic community
10. National Association of Independent Real Estate Brokers (NAIR-EB) — serves only independent brokers
11. National Association of Real Estate Appraisers (NAREA) — covers only appraisers
12. National Association of Real Estate Brokers (NAREB) — primarily devoted to the needs of minority brokers
The district court relied heavily upon the First Circuit’s decision in Wells Real Estate. We believe that decision effectively captured the central flaw in Reifert’s argument.
[The plaintiff] has failed to demonstrate the slightest market for membership in real estate boards that might have been affected by the defendants’ alleged tying arrangement. There is no evidence that any other broker would have “purchased” membership in any other board but for the power exerted by the lure of the defendants’ MLS. There is no evidence that a substantial volume of “commerce” in board membership was foreclosed by the tie-in. The tying claim must fail absent any proof of anti-competitive effects in the market for the tied product.
Wells Real Estate, Inc., 850 F.2d at 815 (footnotes omitted).
While the organizations the plaintiff named may provide important services, they simply do not compete with RASCW or any other Realtors Association. These niche associations lack cross-price elasticity with the national and local Realtors Associations, and have dissimilar purposes. These organizations are unlikely substitutes for a Realtors Association in Wisconsin.
Instead of providing the district court with the required economic analysis, Rei-fert employs a 30-year old decision from this Court, Beatrice Foods Co. v. FTC, 540 *320 F.2d 303, 308 (7th Cir.1976), to frame his discussion of competition. Beatrice Foods Co. relied upon the Supreme Court’s decision in Brown Shoe Co., 370 U.S. at 325, 82 S.Ct. 1502, and set forth several “practical indicia” to determine a market’s boundaries. “These indicia are (1) the industry or public recognition of the submarket as a separate economic entity, (2) the product’s peculiar characteristics and uses, (3) unique production facilities, (4) distinct customers, (5) distinct prices, (6) sensitivity to price changes, and (7) specialized vendors.” Beatrice Foods Co., 540 F.2d at 308. While the “practical indicia” named in Brown Shoe and Beatrice Foods Co. are important considerations in defining a market, they were never intended to exclude economic analysis altogether. Both opinions recognized the importance of economic analysis, including cross-price elasticity of demand. See Brown Shoe, 370 U.S. at 325, 82 S.Ct. 1502 (“The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.”); see also Beatrice Foods Co., 540 F.2d at 308.
This Court has emphasized the use of economic analysis in the law. To demonstrate competition in an antitrust case, the plaintiff must provide an economic analysis of the relevant market. See, e.g., Menasha, 354 F.3d 661 (requiring economic evidence to prove the existence of a distinct market). Lacking any economic evidence, Reifert has failed to show that the tying arrangement has foreclosed any portion of the market for real estate services.
The facts of the instant case stand in contrast to the situation analyzed by the Eleventh Circuit in Thompson. The defendants in Thompson operated an MLS system and tied MLS access to membership in a Realtors Association. The Plaintiff, Empire Real Estate Board, was “founded in 1939 as an African American professional association because, at that time, the Realtors [Association] excluded African Americans from membership.” Thompson, 934 F.2d at 1570. The plaintiffs proved that as a result of the tie and the prohibitive cost of joining two groups, 400 brokers either did not join or quit the Empire Real Estate Board. Thompson held that where a competitor offering similar services loses four hundred members because of a tie between an association of real estate agents and an MLS service, there has been a substantial effect on interstate commerce. Id. at 1578. In our case, however, the plaintiff has not presented an organization equivalent to Empire Real Estate Board. Thompson presented a valid competitor; neither Wells nor the instant case does. Thus, Thompson demonstrated a substantial effect on interstate commerce, while Reifert has not.
Having found no competitors, there are many issues raised in the parties’ briefs that we need not reach. We need not decide whether the quantity of interstate commerce affected is “not-insubstantial,” nor must we address whether SCWMLS has a sufficient economic interest in the sales of the tied product to satisfy the fourth element of an unlawful tying arrangement.
B. Group Boycott Claim
 Reifert also asks this Court to consider the district court's gTant of summary judgment to the defendants on his group boycott claim. A group boycott traditionally occurs when a particular group or individual is prohibited from joining an organization. "Where there are no exclusionary conditions attached to Realtor board membership, and there is no contention that the cost is prohibitively high, it is difficult to see any affront to competition." *321 Pomanowski v. Monmouth County Bd. of Realtors, 89 N.J. 306, 446 A.2d 83, 92 (N.J.1982). In the instant case, no licensed real estate agent was denied access to SCWMLS because of an anti-competitive measure.
To prove a group boycott, a plaintiff must establish that the membership requirement has had an adverse impact upon competition in the market for the tied product. As stated above, Reifert has failed to demonstrate the existence of a competitive market for Realtors Association memberships. Thus, there is no need to balance the pro-competitive effects of the Realtors Association membership requirement against its anti-competitive effects. See Buyer’s Comer Realty, Inc., 410 F.Supp.2d at 583-84 (citing O’Riordan, 707 F.Supp. at 116).
C. Anti-Competitive Effects of the Code of Ethics
Reifert claims that Article 16 of the Code of Ethics of the National Association of Realtors is anti-competitive and violates Section I of the Sherman Act, 15 U.S.C. § 1. Article 16 prohibits members of the National Association of Realtors from interfering with the exclusive agreements other members have established with clients.
Reifert’s allegations concerning the anti-competitive effects of Article 16, however, are overly broad. As the National Association of Realtors, Code of Ethics Standard of Practice 16-2 states, “Article 16 does not preclude Realtors® from making general announcements to prospects describing their servicesf.]” Rather, the Article’s purpose is to prevent the targeted solicitation of individuals who have exclusively listed their property with another agent and to prevent agents from improperly using multiple listing services as a data bank of potential customers.
We must review a challenge to Article 16 under the rule of reason to determine whether the agreement contributes to competition and productivity. See Nat’l Soc’y of Prof'l Eng’rs v. United States, 435 U.S. 679, 695, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). Under the rule of reason, Reifert had the burden to demonstrate that Article 16’s net effect was anti-competitive. See Bi-Rite Oil Co. v. Ind. Farm Bureau Co-op. Ass’n, Inc., 908 F.2d 200, 203 (7th Cir.1990).
The balance between pro- and anti-competitive effects weighs heavily in favor of Article 16. Even in “open” MLS areas such as Massachusetts and Alaska, where individuals who have not joined a Realtors Association may access an MLS service, users must agree not to solicit the exclusive listings of other MLS users during the term of the listing. If agents were reluctant to post their listings, for fear that other agents would steal their clients, the market would become less transparent and less efficient. Article 16 aids competition and fulfills the purposes of the Sherman Act by providing a more transparent marketplace.
III. Conclusion
For the foregoing reasons, the judgment of the district court is AffiRMed.

. “Realtors Associations” are organizations affiliated with the National Association of Realtors and have agreed to abide by the NAR Code of Ethics. RASCW is an example of a local Realtors Association.

. We agree with our concurring colleague that a cautious approach is always appropriate when anticipating future Supreme Court actions. In 1985, our Circuit began to incorporate the rule of reason in our tying analysis. At that time, we stated that, “According to the Supreme Court, a plaintiff's failure to state a per se illegal antitrust claim does not necessarily prove fatal to his case if he can state a claim under the rule of reason.” Carl Sandburg Vill. Condo. Ass’n No. 1, 758 F.2d 203, 210 (7th Cir.1985) (citing Fortner Enter., Inc. v. United States Steel Corp., 394 U.S. 495, 499-500, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); Warner Mgmt. Consultants, Inc. v. Data Gen. Corp., 545 F.Supp. 956, 966 (N.D.Ill.1982)); see also Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 35, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) (O'Connor, J„ concurring) (“The time has therefore come to abandon the 'per se ’ label and refocus the inquiry on the adverse economic effects, and the potential economic benefits, that the tie may have.”). In a related area, the Supreme Court recently adopted Justice O'Connor's reasoning in Jefferson Parish Hosp. Dist. No. 2 and held that tying arrangements involving patents should be evaluated based upon their market power “rather than under the per se rule.” Ill. Tool Works, Inc. v. Indep. Ink, Inc., - U.S. -, 126 S.Ct. 1281, 164 L.Ed.2d 26 (2006). Although the per se analysis of the Jefferson Parish Hosp. Dist. No. 2 majority has not been expressly overruled, in the intervening twenty-one years since Carl Sandburg Vill. Condo. Ass’n No. 1, the Supreme Court has not found occasion to disagree with this Circuit’s approach.