# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 03-1302

MENASHA CORPORATION,

<em>Plaintiff-Appellant,</em>

v.

NEWS AMERICA MARKETING IN-STORE, INC.,
and NEWS AMERICA MARKETING IN-STORE
SERVICES, INC.,

<em>Defendants-Appellees.</em>

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 00 C 1895—**Harry D. Leinenweber**, *Judge.*

_____

ARGUED DECEMBER 4, 2003—DECIDED JANUARY 9, 2004

_____

Before BAUER, EASTERBROOK, and EVANS, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* The principal question in this antitrust suit is whether at-shelf coupon dispensers are an economic market. The district court granted summary judgment for the defendants (which the parties abbreviate to NAMIS) after concluding that no reasonable juror could find that producing a large share of at-shelf coupon dispensers confers market power. 238 F. Supp. 2d 1024 (N.D. Ill. 2003).

Coupons promote sales without lowering the price to everyone (that is, holding a "sale"). Only customers who hand over coupons at checkout receive the lower price. Couponing is a form of price discrimination: customers who are willing to track down, clip, and carry around coupons probably have a lower value of time, and as a rule less income, than those who disdain coupons. Supermarkets offer these more price-sensitive customers lower net prices for their products while avoiding price reductions across the board. See Robert C. Blattberg & Scott A. Neslin, *Sales Promotion: Concepts, Methods, and Strategies* 268, 277 (1990). Most coupons are distributed by mail or in newspaper supplements. In 1991 ActMedia introduced a new distribution method: dispensers attached to store shelves next to the product to which the coupons pertain. This makes discounts available to consumers who do not take the time to locate coupons and carry them to the stores, and thus undermines the price-discrimination effect, but may be useful in introducing new or revised products: at-shelf coupons may be substitutes for signs screaming "NEW! IMPROVED!" and may be more successful in inducing people to sample the product. The ActMedia plastic dispenser uses flashing lights to attract consumers; Menasha, the plaintiff in this case, entered the business later with less flashy cardboard containers. (Menasha is principally a paper-products manufacturer.) It uses four-color graphics in lieu of shiny plastic and blinking bulbs. Other firms have tried tear-off pads and ad-festooned mats, among other means of getting consumers to take notice once inside stores.

Manufacturers rather than retail outlets choose couponing and most other distribution strategies, so ActMedia and all other firms in this business sell their dispensers to the manufacturers, usually at a price per loaded dispenser or pad (which is expected to last for a week or so). To attract manufacturers, the coupon merchants sign up retailers; one

can think of firms such as ActMedia having an inventory of retailers as well as a couponing strategy to sell manufacturers—and the retailers may want compensation in exchange for their cooperation. ActMedia initially offered retailers a cut of what the manufacturers paid; rivals were free to compete by offering a larger cut or some other inducement. The retailers most attractive to manufacturers are those that have signed exclusive contracts, for then when Nabisco places at-shelf dispensers for Oreo cookies it knows that there will not be another dispenser on the adjoining shelf promoting Procter & Gamble's sandwich cookies.

NAMIS entered the at-shelf couponing business in 1996 and duplicated ActMedia's strategy of signing retailers to exclusive contracts in exchange for a percentage of what the manufacturers paid. In 1997 NAMIS acquired ActMedia, and the combined venture places more than half of all at-shelf retail coupons. Menasha does not pursue exclusive contracts or offer compensation—and thus by and large avoids exclusivity clauses, which promise the manufacturers only that there will be no other at-shelf coupon dispensers that the retailer had been paid to allow. NAMIS has been more successful in supermarkets and drug store chains, while Menasha has had greater success in smaller food outlets (such as convenience stores) and in dry-goods stores. But some retailers do not use any point-of-sale promotional device; Wal-Mart, for example, deems at-shelf coupons incompatible with its approach of setting prices low all the time and for all shoppers.

Menasha believes that NAMIS has violated the federal antitrust laws by signing retailers to exclusive contracts, which it characterizes as excluding competition. When a given contract does not forbid retailers to use at-shelf coupons that the store is not paid to install, Menasha contends, NAMIS's route personnel (who install and service the dispensers) sometimes rip any rival's coupon devices off the

shelves. But it is not just dirty tricks and exclusive terms that upset Menasha. It is particularly exercised by the fact that NAMIS has negotiated some contracts that bar "free" competing dispensers and has adopted a policy of staggering its contracts' expiration dates—so that, for example, its contract with Safeway may expire in 2004 and its contract with Walgreen in 2005. One might think that staggered expiration dates make entry easier; Menasha (or any other rival) can sign up chains as their exclusives expire, without having to enroll the entire retail industry at one go. But, as Menasha sees things, the different expiration dates make it harder for a rival to sign up the *whole* retail industry at one time. (Menasha does not notice the irony that under its reasoning this sign-up-everyone strategy would create an unlawful monopoly. Perhaps Menasha should thank NAMIS for keeping it on the straight and narrow.)

In the district court Menasha argued that these contractual devices, which it deems exclusionary, are unlawful *per se*. That argument has been abandoned on appeal—sensibly so, as competition for the contract is a vital form of rivalry, and often the most powerful one, which the antitrust laws encourage rather than suppress. See, e.g., *Paddock Publications, Inc. v. Chicago Tribune Co.*, 103 F.3d 42 (7th Cir. 1996). Both NAMIS and Menasha sell to manufacturers (and secondarily to retailers). Why would these entities shoot themselves in the feet by signing (retailers) or favoring (manufacturers) exclusive contracts that entrench NAMIS as a monopolist that then can apply the squeeze? (Menasha does not contend that they are trapped in a collective-action bind, each fearing the worst if it holds out while others sign.) That retailers and manufacturers *like* exclusive deals implies that they serve the interests of these, the consumers of couponing services. When the consumers favor a product or practice, and only rivals squawk, the most natural inference is that the complained-of practice pro-

motes rather than undermines competition, for what helps consumers often harms other producers such as Menasha.

These considerations show that NAMIS's practices could not be condemned without detailed analysis under the Rule of Reason. The first requirement in every suit based on the Rule of Reason is market power, without which the practice cannot cause those injuries (lower output and the associated welfare losses) that matter under the federal antitrust laws. See, e.g., *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2 (1984); *Elliott v. United Center*, 126 F.3d 1003 (7th Cir. 1997); *Digital Equipment Corp. v. Uniq Digital Technologies, Inc.*, 73 F.3d 756 (7th Cir. 1996); *Chicago Professional Sports Limited Partnership v. National Basketball Ass'n*, 95 F.3d 593 (7th Cir. 1996); *Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc.*, 784 F.2d 1325 (7th Cir. 1986); *Polk Bros., Inc. v. Forest City Enterprises, Inc.*, 776 F.2d 185 (7th Cir. 1985). Any given firm may cut its own output, but rivals will increase production in response. And that was the district court's conclusion: if NAMIS cuts output of at-shelf coupon dispensers, manufacturers can add more newspaper or on- package coupons, or stores could hold more sales, or Floor Graphics (another firm in the promotions business) could supply more mats that draw attention to products, or stores could conduct more demonstrations and offer samples (with or without coupons handed out live). The number of ways to promote a product is large, and even a stranglehold over at-shelf coupon dispensers would affect only a tiny portion of these means.

Menasha had an uphill battle to show that at-shelf coupon dispensers are a distinct market, in the sense that a reduction in output of at-shelf coupons will create higher prices for promotional devices. These dispensers may be *physically* distinct from newspaper coupons or stuck-to-the-product-box coupons, but that differs from

creating separate economic markets. See *United States v. Continental Can Co.*, 378 U.S. 441 (1964) (metal and glass containers are in same market). Otherwise NAMIS's electro-mechanical dispensers and Menasha's cardboard boxes would be in different markets and Menasha's case would collapse. Menasha's problem instead is that, as customer attractants, at-shelf coupons compete against signs and placards, end caps (product racks at the end of aisles), sales, coupons included on (or in) the product's package, coupons distributed at the checkout counter, and against the traditional coupons distributed by mail or newspaper. What would lead a reasonable person to think that the leading supplier of one form of coupon has the power to drive up price, given the plethora of substitutes?

Economics, like the other social sciences, has its share of counterintuitive findings, so observing things that to the untutored eye seem to be substitutes need not mean that they *are* good substitutes. One way to approach the question would have been to inquire whether there is a relation between output of at-shelf coupons and the price of promotional services. See William M. Landes & Richard A. Posner, *Market Power in Antitrust Cases*, 94 Harv. L. Rev. 937 (1981). Menasha did not offer any evidence along these lines. Another approach would have been to inquire whether the prices of different promotional devices move together. If the prices of at-shelf coupon dispensers rise when the process of other couponing systems rise, then they are probably in the same market; but if the price of one couponing system varies while others stay the same, then they probably are in different markets. See George J. Stigler & Robert A. Sherwin, *The Extent of the Market*, 28 J.L. & Econ. 555 (1985). Yet Menasha did not analyze the covariance of prices. Indeed, Menasha introduced no econometric evidence of any kind, even though it engaged a group of specialists in industrial organization (Microeco-

nomic Consulting & Research Associates, Inc.) and presented a lengthy expert report signed by Frederick Warren-Boulton, an economist well situated to provide such evidence if any existed (and were favorable to Menasha).

Instead of econometric analysis, Menasha offered a potpourri of survey research and armchair economics. It offered, for example, a survey by a James Tenser, a journalist who asked friends and acquaintances whether they like at-shelf coupons better than other kinds of coupons. He reported that they do. The district judge found that Tenser's "survey" used none of the devices essential to survey research, and it was rejected under Fed. R. Evid. 702 as unscientific. 238 F. Supp. 2d at 1030-31. The report of James Langenfeld, Menasha's marketing expert, was heavily dependent on Tenser's survey and collapsed when Tenser's "data" were pitched out. The Tenser–Langenfeld emphasis on consumer preference is economically irrelevant anyway. Suppose that a well-conducted survey shows that vanilla is people's favorite flavor of ice cream, and by a large margin. It would not follow that vanilla ice cream is a separate market, because if its price rises any other ice cream producer could make more vanilla and less chocolate or pistachio. For a closely related reason, Langenfeld's conclusion that at-shelf coupons uniquely appeal to "impulse shoppers" (that is, shoppers who do not prepare in advance by clipping coupons from the Sunday supplements) does not identify an economic market. Attributes of shoppers do not identify markets. An example from *United States v. Rockford Memorial Corp.*, 888 F.2d 1278, 1284 (7th Cir. 1990), shows why. Suppose that diabetics must drink low-calorie soft drinks, if any at all. Could producers of artificially sweetened soft drinks raise prices as a result of these "locked in" customers? No, they could not. A price increase not only would drive non- diabetic customers to other products but also would induce rivals to switch some

of their production from standard drinks to artificially sweetened ones. The healthy customers, and the producers, combine to protect the diabetic customers. Just so with coupons. Careful shoppers and other producers protect the impulse buyers (or, to be accurate, protect the manufacturers that want to sell to impulse buyers). See also Warren G. Lavey, *A Close Analysis of Buyers and Antitrust Markets*, 61 Wash. L.Q. 745, 763-64 (1983).

Warren-Boulton's report relies on Langenfeld's and suffers derivatively. He also opined that events during 1996, when ActMedia and NAMIS were competing head-to-head, show that at-shelf coupons are a distinct market. According to Warren-Boulton, the number of at-shelf dispensers placed during 1996 rose, demonstrating that this product is its own market. Competition increased output and also increased the slice of manufacturers' revenues offered to retailers. (We omit details about these and many other matters; the parties have agreed that prices and precise output figures of the producers should be held in confidence.)

Menasha's approach assumes what is to be established: that at-shelf dispensers are a market. To know whether "output" rose, we would need to learn what happened to other forms of coupons. If at-shelf coupons became more common and other forms of coupons less common, this would show substitution and the *absence* of a market limited to at-shelf coupons; yet Warren-Boulton did not inquire what happened to the output of other promotional devices during this period. The statement "sales of X rose, therefore X is a market" does not hold water. Consider a parallel: General Motors has a plant near Rockford, Illinois. Now suppose Ford opens an assembly plant close by, doubling the output of cars in northern Illinois. Would this show that "auto assembly in northern Illinois" is an economic market? Surely not. Most output of those plants

is exported to other states; and most cars purchased in northern Illinois would be imported from other states and nations. Nor would it follow, if Ford later sold this plant to GM, that there had been a "merger to monopoly" even though GM then had a "northern Illinois share" of 100%. It is substitution in both production and consumption that prevents the existence of a northern-Illinois market in auto manufacture or a Pittsburgh market in steel production.

Only by *assuming* that at-shelf coupons are a market (that is, that consumers do not substitute between these and other devices) could one find significance in the "expansion of output" during 1996; but then it is the assumption, and not the events under study, that ends up "defining" the market. Garbage in, garbage out. The competing explanation of what happened in 1996 is that NAMIS tried to enter by reducing price (equivalent to higher payments to retailers) in order to secure a presence, but discovered that all it was doing was moving business toward at-shelf dispensers away from other couponing devices, and thus was not accomplishing much for either consumers (which, recall, are the product manufacturers) or itself, and gave up. Substitutability implies the lack of a market. It is possible to test whether at-shelf coupons and other promotional devices are substitutes—and thus to discriminate between the hypothesis that extra revenue sharing during 1996 was a discount to facilitate entry and the hypothesis that lower revenue sharing after 1996 was a monopolistic price increase—but nothing in Langenfeld's or Warren-Boulton's analysis does so.

Menasha contends that a jury could infer market power from the fact that NAMIS's prices have risen with its share of at-shelf coupons and that NAMIS consistently is able to sell its dispensers for more than marginal cost. Menasha calls these facts evidence of market power. And that might well be right—if they *were* facts, which as far as we can tell

they are not. What Menasha calls "price" is the *list* price of the dispensers, and it is undisputed that few if any dispensers sell for list price. NAMIS offers evidence that transaction prices have fallen, and Menasha has no effective counter. What Menasha calls "cost" is not the marginal cost of deploying the dispensers—a measure of cost that includes the wages and commissions of large sales and service staffs, which are variable rather than fixed costs—but the cost of manufacturing the dispensers. Well, *of course* NAMIS's price exceeds *that* measure of cost, and by a lot. How else could it pay for the staff that places dispensers and removes outdated ones, let alone for the other expenses of doing business? The record does not suggest that NAMIS obtains an unusually high return on the capital invested in this business.

Menasha added a business-tort claim (interference with contract) to its antitrust theory, but this was soundly handled by the district court. It does not require separate discussion here.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*