In the

# United States Court of Appeals
### For the Seventh Circuit

No. 05-3601

JAY REIFERT,

*Plaintiff-Appellant,*

*v.*

SOUTH CENTRAL WISCONSIN MLS CORPORATION,
REALTORS ASSOCIATION OF SOUTH CENTRAL
WISCONSIN, INC., ROBERT L. COURTER, SUSAN
MATTHEWS, DAVID STARK, ROBERT WEBER,
THOMAS BUNBURY, MAURICE W. HILL, PETER SVEUM,
MARSHALL ZWYGART, and DAVID MCGRATH,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Wisconsin.
Case No. 04-C-0969-S—**John C. Shabaz**, *Judge.*

ARGUED FEBRUARY 17, 2006—DECIDED JUNE 12, 2006

Before FLAUM, *Chief Judge,* and KANNE and WOOD,
*Circuit Judges.*

FLAUM, *Chief Judge.* Plaintiff-Appellant Jay Reifert
claims that the defendants violated the Sherman Act by
tying access to a real estate multi-listing service ("MLS") to
membership in a Realtors Association. The district
court granted summary judgment for all defendants in
this case, finding no competition in the tied market and
therefore, no antitrust violation.

For the following reasons, we now affirm the judgment of the district court.

## I.  Background

Realtors Association of South Central Wisconsin, Inc. ("RASCW") is a real estate trade association. Its members are real estate agents and appraisers in and around Madison, Wisconsin. RASCW offers a variety of products and services to its members, including lobbying, social functions, courses, referral programs, contract forms, conventions, publications, and legal information.

RASCW is associated with the Wisconsin Realtors Association and the National Association of Realtors ("NAR"). When a person pays membership dues to an association affiliated with NAR, that person becomes a member of NAR. Normally, Realtors Association[1] memberships are packaged as a group including local, state, and NAR memberships.

RASCW owns 100% of the stock in the South Central Wisconsin MLS Corp. ("SCWMLS"). The MLS or multiple listing service is a computerized database of homes and properties listed for sale by SCWMLS participants in south-central Wisconsin. Access to this multiple listing service is a necessity for real estate agents and appraisers in this area. Virtually all active residential real estate agents in the region subscribe to SCWMLS. Users are charged a quarterly fee to gain access to the full database and must be a member of a Realtors Association affiliated with NAR. The Realtors Association membership requirement has existed

---

[1] "Realtors Associations" are organizations affiliated with the National Association of Realtors and have agreed to abide by the NAR Code of Ethics. RASCW is an example of a local Realtors Association.

for more than fifty years. Generally, any licensed real estate professional who agrees to abide by the NAR Code of Ethics and pays the applicable fees is admitted.

Article 16 of NAR's Code of Ethics contains a "non-solicitation" rule. This article and the related standards of practice prohibit members from inducing sellers to breach listing contracts, advising sellers of superior services or prices during the time they are under contract with another Realtor, and using "information received through a Multiple Listing Service . . . to target clients of other Realtors®."

A member-elected board of directors sets dues for RASCW. Fees for SCWMLS are also set by members elected to a board of directors. Both organizations set their fees solely to cover operational costs, with no profit-making intent. Annual dues to join the NAR, Wisconsin Association of Realtors, and RASCW are approximately $449 a year.

The plaintiff, Jay Reifert, brings three claims against SCWMLS, RASCW, and the directors of SCWMLS. First, he alleges that SCWMLS unlawfully ties its services to RASCW. Second, Reifert alleges that by conditioning access to MLS service on membership in RASCW, an unlawful group boycott has occurred. Finally, Reifert alleges that Article 16 of the NAR Code of Ethics violates the Section I of the Sherman Act, 15 U.S.C. § 1, by prohibiting competition.

Reifert, is a residential real estate broker, exclusively representing buyers of real estate in south central Wisconsin. Reifert has been a member of RASCW (or its predecessor) and a participant in SCWMLS (or its predecessor) since 1988. Reifert belongs to the National Association of Exclusive Buyer's Agents ("NAEBA") and has no desire to maintain membership in RASCW or the state and national Association of Realtors. Reifert objects to the fees he is forced to pay for unwanted services and the Code of Ethics he must follow to maintain his membership in RASCW and NAR.

Reifert claims that during the four years at issue in this action, he has paid dues in excess of $2000 for an unwanted RASCW membership to maintain his SCWMLS access. During the relevant four-year period, there have been approximately 2,079 annual and 5,600 total SCWMLS participants.

To support an antitrust action, a plaintiff must demonstrate that the defendant's actions have restrained competition. Section I of the Sherman Act states, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal." 15 U.S.C. § 1. The Supreme Court has long recognized that Congress intended to outlaw only "unreasonable restraints," not all contracts in restraint of trade. *See State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) (citations omitted). The Clayton Act allows for private suits by individuals injured by violations of antitrust laws. *See* 15 U.S.C. §§ 15, 26.

On August 25, 2005, the district court granted summary judgment to the defendants and denied summary judgment to the plaintiff. A tying arrangement violates federal antitrust statutes if it has a substantial effect on interstate commerce. The district court found that "there is insufficient evidence for a fact finder to find that a tie between the defendant's multiple listing service and Realtor membership has had an effect on interstate commerce as that element has been defined by the Supreme Court."

As to Reifert's group boycott claim, the district court again found that the plaintiff had failed to prove any anticompetitive effects resulting from the tying of Realtors Association memberships to MLS services. Accordingly, the district court granted summary judgment to the defendants.

## II. Discussion

We review a district court's grant of summary judgment de novo, taking all facts in the light most favorable to the non-moving party. *See, e.g., McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003) (citations omitted). An award of summary judgment is proper when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### A. Tying Claim

Reifert claims that the defendants have engaged in an unlawful tying arrangement by limiting SCWMLS access to members of a Relators Association. Thus, the alleged "tying product" is SCWMLS and the alleged "tied product" is membership in a Realtors Association.

In determining whether a violation of Section I of the Sherman Act, 15 U.S.C. § 1, has occurred as a result of a tie between two products or services, this Court requires the plaintiff to prove four elements. *See Carl Sandburg Vill. Condo. Ass'n No. 1 v. First Condo. Dev. Co.,* 758 F.2d 203, 208 (7th Cir. 1985) (citing imposition of the "economic interest requirement . . . by courts in the Second, Third, Fourth, Fifth, Sixth, Ninth, and Eleventh Circuits").

> In order to establish the per se illegality of a tying arrangement, a plaintiff must show that: (1) the tying arrangement is between two distinct products or services, (2) the defendant has sufficient economic power in the tying market to appreciably restrain free competition in the market for the tied product, and (3) a not insubstantial amount of interstate commerce is affected. [ *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5-6 (1958)]; *Moore v. Matthews & Co.*, 550 F.2d 1207, 1212 (9th Cir. 1977). In addition, this circuit has held

that an illegal tying arrangement will not be found where the alleged tying company has absolutely no economic interest in the sales of the tied seller, whose products are favored by the tie-in. *Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821, 835 (7th Cir. 1978), *cert. denied*, 440 U.S. 930 (1979); *Warner Mgmt. Consultants, Inc. v. Data Gen. Corp.*, 545 F.Supp. 956, 967 (N.D.Ill. 1982).

*Id.* at 207-08.

Following this precedent, the district court correctly required Reifert to prove the following four elements of a tying violation: (1) a tie exists between two separate products; (2) the tying seller (SCWMLS) has sufficient economic power in the tying product market to restrain free competition in the tied product market (Realtors Association memberships); (3) the tie affects a not-insubstantial amount of interstate commerce in the tied product (Realtors Association memberships); and (4) the tying seller (SCWMLS) has some economic interest in the sales of the tied product (Realtors Association memberships). *Id.* at 207.[2]

---

[2] We agree with our concurring colleague that a cautious approach is always appropriate when anticipating future Supreme Court actions. In 1985, our Circuit began to incorporate the rule of reason in our tying analysis. At that time, we stated that, "According to the Supreme Court, a plaintiff's failure to state a *per se* illegal antitrust claim does not necessarily prove fatal to his case if he can state a claim under the rule of reason." *Carl Sandburg Vill. Condo. Ass'n No. 1*, 758 F.2d 203, 210 (7th Cir. 1985) (citing *Fortner Enter., Inc. v. United States Steel Corp.*, 394 U.S. 495, 499-500 (1969); *Warner Mgmt. Consultants, Inc. v. Data Gen. Corp.*, 545 F. Supp. 956, 966 (N.D. Ill. 1982)); *see also Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 35 (1984) (O'Connor, J., concurring) ("The time has therefore come to

(continued...)

There is no question that Reifert has satisfied the requirements for the first two elements. First, access to the multi-listing service cannot be obtained without purchasing the tied product, a Realtors Association membership. Second, SCWMLS has sufficient market power to restrain free competition in the tied product market.

SCWMLS is a unique product. Nearly every available home in the relevant geographic area is listed on the service. The near-perfect market information created by SCWMLS is the result of a requirement that members place all listings in the MLS within five days. The MLS allows individuals with access to search and filter properties based upon detailed criteria including compensation offered to buyers' agents, detailed property information, neighborhood information, prior sales history, offers made on the property, days on the market, and the sale price of comparable homes. The features and information available through SCWMLS are not available through any other service. In addition, the MLS service targets a different audience—real estate agents and appraisers—than free listing services or newspapers. In short, it is impossible to perform the tasks of a real estate agent or appraiser in the relevant geo-

---

[2] (...continued)
abandon the *'per se'* label and refocus the inquiry on the adverse economic effects, and the potential economic benefits, that the tie may have."). In a related area, the Supreme Court recently adopted Justice O'Connor's reasoning in *Jefferson Parish Hosp. Dist. No. 2* and held that tying arrangements involving patents should be evaluated based upon their market power "rather than under the per se rule." *Ill. Tool Works, Inc. v. Indep. Ink, Inc.*, 126 S.Ct. 1281 (2006). Although the *per se* analysis of the *Jefferson Parish Hosp. Dist. No. 2* majority has not been expressly overruled, in the intervening twenty-one years since *Carl Sandburg Vill. Condo. Ass'n No. 1*, the Supreme Court has not found occasion to disagree with this Circuit's approach.

graphic area without using SCWMLS. Thus, it possesses sufficient market power to restrain competition.

The third element of the *Sandburg* test states that a tying arrangement violates antitrust law only if "a substantial volume of commerce is foreclosed" because of the tie. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 16 (1984). This element can be broken into two sub-questions: (1) Is there at least one competitor in the tied product market other than the favored seller; and (2) Is the quantity of interstate commerce affected not-insubstantial?

The district court found no competition in the allegedly tied market for Realtors Association memberships. Where there is no competition in the tied market, there can be no antitrust violation. Forcing a buyer to purchase a product he otherwise would not have purchased is insufficient to establish the foreclosure of competition. *Id*. ("[W]hen a purchaser is 'forced' to buy a product he would not have otherwise bought even from another seller in the tied product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed.").

Despite Reifert's desire to avoid purchasing a Realtors Association membership, without evidence of competitors in the market for services offered by the Realtors Association, there can be no foreclosure of competition. *See Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821, 835 (7th Cir. 1978); 9 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 1723a (2d ed. 2004) ("When there are no rival sellers of the tied product to be foreclosed, then the alleged tie-in might affect a substantial volume of commerce in the tied product and yet not foreclose anyone."). The district court correctly found that despite the "laundry list of entities" submitted by the plaintiff, there were no competitors in the tied product market.

Products and services are in the same market when they are good substitutes for one another. "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).

This Court requires that a plaintiff prove that products are good substitutes using economic evidence; a conclusory assumption of competition where products or services appear to be similar is insufficient. *See Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 664 (7th Cir. 2004). Actual data and a reasonable analysis are necessary to demonstrate that a product or service is a good substitute for another. "Economics, like the other social sciences, has its share of counterintuitive findings, so observing things that to the untutored eye seem to be substitutes need not mean that they *are* good substitutes." *Id.*

Other federal courts have held that conditioning access to a multi-listing service on membership in a Realtors Association is not indicative of an unlawful tying arrangement. *See Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors,* 850 F.2d 803 (1st Cir. 1988); *O'Riordan v. Long Island Bd. of Realtors, Inc.*, 707 F. Supp. 111 (E.D.N.Y. 1988); *Buyer's Corner Realty, Inc. v. No. Ky. Ass'n of Realtors,* 410 F. Supp. 2d 574 (E.D. Ky. 2006). One federal court has held that a tied real estate association group faced competition and therefore created an unlawful tie; as explained below, however, we find that case distinguishable. *See Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566 (11th Cir. 1991).

Reifert argues that by comparing participation in Realtors Associations in areas where MLS services are "open" to individuals who have not joined a Realtors Association with so called "closed" areas that require membership in a Realtors Association, he can demonstrate that agents have been forced to purchase Realtors Association memberships. This comparison is unreliable, however, because it fails to

speak to the central question of whether a competitor exists in this particular "closed" market and does not account for other possible explanations for the observed differences. Forcing individuals in Reifert's position to purchase a product they do not want is not a violation of antitrust law. *See Jefferson Parish Hosp. Dist. No. 2*, 466 U.S. at 16.

Even without an economic analysis, it is apparent that RASCW lacks competition. Each of the twelve organizations cited by Reifert fails to qualify as a competitor to the national or local Realtors Association:

1.  Appraisal Institute (AI)- covers only appraisers

2.  Asian Real Estate Agent Association (AREAA)—serves a distinct ethnic community

3.  Chinese American Real Estate Professionals Association (CAREPA)—serves a distinct ethnic community

4.  Chinese Real Estate Association of America (CREAA)—serves a distinct ethnic community

5.  Colorado Association of Exclusive Buyer Agents (CAEBA)—covers only exclusive buyer agents

6.  Massachusetts Association of Buyer Agents (MABA)—covers only exclusive buyer agents

7.  National Association of Exclusive Buyer Agents (NAEBA)—covers only exclusive buyer agents

8.  National Association of Independent Fee Appraisers (NAIFA)—covers only appraisers

9.  National Association of Hispanic Real Estate Professionals (NAHREP)—serves a distinct ethnic community

10. National Association of Independent Real Estate Brokers (NAIREB)—serves only independent brokers

11. National Association of Real Estate Appraisers (NAREA)—covers only appraisers

12. National Association of Real Estate Brokers (NAREB)—primarily devoted to the needs of minority brokers

The district court relied heavily upon the First Circuit's decision in *Wells Real Estate*. We believe that decision effectively captured the central flaw in Reifert's argument.

> [The plaintiff] has failed to demonstrate the slightest market for membership in real estate boards that might have been affected by the defendants' alleged tying arrangement. There is no evidence that any other broker would have "purchased" membership in any other board but for the power exerted by the lure of the defendants' MLS. There is no evidence that a substantial volume of "commerce" in board membership was foreclosed by the tie-in. The tying claim must fail absent any proof of anti-competitive effects in the market for the tied product.

*Wells Real Estate, Inc.*, 850 F.2d at 815 (footnotes omitted).

While the organizations the plaintiff named may provide important services, they simply do not compete with RASCW or any other Realtors Association. These niche associations lack cross-price elasticity with the national and local Realtors Associations, and have dissimilar purposes. These organizations are unlikely substitutes for a Realtors Association in Wisconsin.

Instead of providing the district court with the required economic analysis, Reifert employs a 30-year old decision from this Court, *Beatrice Foods Co. v. FTC*, 540 F.2d 303, 308 (7th Cir. 1976), to frame his discussion of competition. *Beatrice Foods Co.* relied upon the Supreme Court's decision in *Brown Shoe Co.*, 370 U.S. at 325, and set forth several "practical indicia" to determine a market's boundaries. "These indicia are (1) the industry or public recognition of the submarket as a separate economic entity, (2) the

product's peculiar characteristics and uses, (3) unique production facilities, (4) distinct customers, (5) distinct prices, (6) sensitivity to price changes, and (7) specialized vendors." *Beatrice Foods Co.*, 540 F.2d at 308. While the "practical indicia" named in *Brown Shoe* and *Beatrice Foods Co.* are important considerations in defining a market, they were never intended to exclude economic analysis altogether. Both opinions recognized the importance of economic analysis, including cross-price elasticity of demand. *See Brown Shoe*, 370 U.S. at 325 ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."); *see also Beatrice Foods Co.*, 540 F.2d at 308.

This Court has emphasized the use of economic analysis in the law. To demonstrate competition in an antitrust case, the plaintiff must provide an economic analysis of the relevant market. *See, e.g.*, *Menasha*, 354 F.3d 661 (requiring economic evidence to prove the existence of a distinct market). Lacking any economic evidence, Reifert has failed to show that the tying arrangement has foreclosed any portion of the market for real estate services.

The facts of the instant case stand in contrast to the situation analyzed by the Eleventh Circuit in *Thompson*. The defendants in *Thompson* operated an MLS system and tied MLS access to membership in a Realtors Association. The Plaintiff, Empire Real Estate Board, was "founded in 1939 as an African American professional association because, at that time, the Realtors [Association] excluded African Americans from membership." *Thompson*, 934 F.2d at 1570. The plaintiffs proved that as a result of the tie and the prohibitive cost of joining two groups, 400 brokers either did not join or quit the Empire Real Estate Board. *Thompson* held that where a competitor offering similar services loses four hundred members because of a tie between an association of real estate agents and an MLS service, there

has been a substantial effect on interstate commerce. *Id.* at 1578. In our case, however, the plaintiff has not presented an organization equivalent to Empire Real Estate Board. *Thompson* presented a valid competitor; neither *Wells* nor the instant case does. Thus, *Thompson* demonstrated a substantial effect on interstate commerce, while Reifert has not.

Having found no competitors, there are many issues raised in the parties' briefs that we need not reach. We need not decide whether the quantity of interstate commerce affected is "not-insubstantial," nor must we address whether SCWMLS has a sufficient economic interest in the sales of the tied product to satisfy the fourth element of an unlawful tying arrangement.

## B. Group Boycott Claim

Reifert also asks this Court to consider the district court's grant of summary judgment to the defendants on his group boycott claim. A group boycott traditionally occurs when a particular group or individual is prohibited from joining an organization. "Where there are no exclusionary conditions attached to Realtor board membership, and there is no contention that the cost is prohibitively high, it is difficult to see any affront to competition." *Pomanowski v. Monmouth County Bd. of Realtors*, 446 A.2d 83, 92 (N.J. 1982). In the instant case, no licensed real estate agent was denied access to SCWMLS because of an anti-competitive measure.

To prove a group boycott, a plaintiff must establish that the membership requirement has had an adverse impact upon competition in the market for the tied product. As stated above, Reifert has failed to demonstrate the existence of a competitive market for Realtors Association memberships. Thus, there is no need to balance the pro-competitive effects of the Realtors Association membership

requirement against its anti-competitive effects. *See Buyer's Corner Realty, Inc.,* 410 F. Supp. 2d at 583-84 (citing *O'Riordan,* 707 F. Supp. at 116).

## C.  Anti-Competitive Effects of the Code of Ethics

Reifert claims that Article 16 of the Code of Ethics of the National Association of Realtors is anti-competitive and violates Section I of the Sherman Act, 15 U.S.C. § 1. Article 16 prohibits members of the National Association of Realtors from interfering with the exclusive agreements other members have established with clients.

Reifert's allegations concerning the anti-competitive effects of Article 16, however, are overly broad. As the National Association of Realtors, Code of Ethics Standard of Practice 16-2 states, "Article 16 does not preclude Realtors® from making general announcements to prospects describing their services[.]" Rather, the Article's purpose is to prevent the targeted solicitation of individuals who have exclusively listed their property with another agent and to prevent agents from improperly using multiple listing services as a data bank of potential customers.

We must review a challenge to Article 16 under the rule of reason to determine whether the agreement contributes to competition and productivity. *See Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978). Under the rule of reason, Reifert had the burden to demonstrate that Article 16's net effect was anti-competitive. *See Bi-Rite Oil Co. v. Ind. Farm Bureau Co-op. Ass'n, Inc.*, 908 F.2d 200, 203 (7th Cir. 1990).

The balance between pro- and anti-competitive effects weighs heavily in favor of Article 16. Even in "open" MLS areas such as Massachusetts and Alaska, where individuals who have not joined a Realtors Association may access an MLS service, users must agree not to solicit the exclusive

listings of other MLS users during the term of the listing. If agents were reluctant to post their listings, for fear that other agents would steal their clients, the market would become less transparent and less efficient. Article 16 aids competition and fulfills the purposes of the Sherman Act by providing a more transparent marketplace.

### III.  Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED.

WOOD, *Circuit Judge,* concurring in the judgment. Although I agree without reservation with the majority's conclusion that the district court correctly granted summary judgment for the defendants in this case, I am concerned that some aspects of its opinion are in tension with the governing Supreme Court doctrine on tying arrangements. For the reasons I explain briefly here, I would take a more cautious approach, and leave further developments in tying law to the high court.

In *Northern Pacific Ry. Co. v. United States,* 356 U.S. 1 (1958), the Supreme Court defined a tying arrangement as "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Id.* at 5-6. As the Court later made clear in *Jefferson Parish Hospital Dist. No. 2 v. Hyde,* 466 U.S. 2 (1984), however, "every refusal to

sell two products separately can not be said to restrain competition." *Id.* at 11. The trick is to distinguish between tying arrangements that are invalid and those that are innocuous, from a competitive standpoint. In *Jefferson Parish,* the Court explained the difference as follows:

> Our cases have concluded that the essential charac-teristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such "forcing" is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated.

*Id.* at 12. Going on, over the objection of Justice O'Connor (who concurred in the judgment because of this point), the majority had this to say about the analytical approach toward tying arrangements:

> *Per se* condemnation—condemnation without inquiry into actual market conditions—is only appropriate if the existence of forcing is probable. Thus, application of the *per se* rule focuses on the probability of anticompetitive consequences.

*Id.* at 15-16. The Court went on to describe the circum-stances under which that probability would exist: first, there must be a substantial potential for impact on competi-tion, which would be shown if a substantial volume of commerce is foreclosed by the arrangement; second, anticompetitive forcing must be likely, which is the case when it is probable that the seller has market power. *Id.* at 16-17. If the seller does not have "either the degree or the kind of market power that enables him to force customers to purchase a second, unwanted product in order to obtain the tying product," then the *per se* rule cannot be used and

the arrangement must be assessed under a full rule of reason. *Id.* at 18.

Despite Justice O'Connor's forceful opinion concurring in the judgment, in which she argued that the time had come to jettison the *per se* rule in tying cases, see *id.* at 35, and despite the opportunity it had as recently as March 2006 to take that step, see *Illinois Tool Works Inc. v. Independent Ink, Inc.,* 126 S.Ct. 1281 (2006), the Court has refused to do so. *Illinois Tool Works* held only that the fact that a tying product is patented does not support a presumption that the seller has market power over that product. See 126 S.Ct. at 1291. It concluded that "tying arrangements involving patented products should be evaluated under the standards applied in cases like *Fortner II* and *Jefferson Parish* rather than under the *per se* rule applied in *Morton Salt* and *Loew's*," both cases involving intellectual property (patents in *Morton Salt*, copyrights in *Loew's*). In my view, *Illinois Tool Works* thus stands only for the proposition that a plaintiff must prove that a holder of intellectual property has "either the degree or the kind of market power that enables him to force customers" to purchase the tied product. If a plaintiff can do so, then the framework established by *Jefferson Parish* continues to apply.

In the case before us, we must decide whether Reifert has produced enough evidence to survive summary judgment with respect to the allegation that the defendant Realtors Associations have tied the multi-listing service (MLS, the tying product) to membership in the Realtors Association of South Central Wisconsin, Inc. (RASCW, the tied product). The district court concluded that Reifert had not come forward with the requisite evidence. I agree. The D.C. Circuit offered a useful summary of the elements of a tying case in *United States v. Microsoft Corp.,* 253 F.3d 34 (D.C. Cir. 2001):

> There are four elements to a *per se* tying violation: (1) the tying and tied goods are two separate products; (2) the defendant has market power in the tying product market; (3) the defendant affords consumers no choice but to purchase the tied product from it; and (4) the tying arrangement forecloses a substantial volume of commerce.

*Id.* at 85. Here, I am willing to say that Reifert has brought forth enough evidence to permit a trier of fact to rule in his favor on the first three of those elements. His proof fails, however, on the fourth.

The key point is not the measurement of how much commerce in the tied product market was affected. It is the fact that Reifert offered no evidence to show that there was any foreclosure in the tied product market. As far as we can tell from this record, no one refrained from joining any other organization because of the cost of membership in the Realtor Associations (RASCW and the others) before us. This is what distinguishes our case from the Eleventh Circuit's opinion in *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566 (11th Cir. 1991). In that case, the court explicitly rested its decision on foreclosure, to which it referred as the "coercion element," explaining that "plaintiffs need to show that [defendant] Metro not only has [ ] market power but also has wielded this market power to force brokers to alter their choice of professional associations." *Id.* at 1577. It then reported that the evidence in the record showed "that 400 of Empire's prospective and current members did not join Empire or quit Empire because of the prohibitive cost." *Id.* at 1578. This is precisely the type of showing that Reifert failed to make.

Analytically, the majority may well be right that the rule of reason approach it sees in *Carl Sandburg Vill. Condo. Ass'n No. 1 v. First Condo. Dev. Co.,* 758 F.2d 203 (7th Cir. 1985), would be a more sensible way to approach all tying

cases. But it is not for this court to anticipate the Supreme Court's overruling of its earlier decisions, even if the passage of time and the impact of later cases that create doctrinal tensions are evident to all. Just as we did in *Khan v. State Oil Co.,* 93 F.3d 1358 (7th Cir. 1996), overruled by *State Oil Co. v. Khan,* 522 U.S. 3 (1997), we should limit ourselves to pointing out the problems we see and then attempting to apply the law as it stands as best we can. In the present case, unlike *State Oil*, faithful application of the existing law leads to the same outcome as the more ambitious approach the majority has chosen. For that reason, I am happy to concur in the outcome that the majority reaches, but I must respectfully decline to join its opinion.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
